212 N.J. Super. 294 (1986)
514 A.2d 1342
IN THE MATTER OF KATHLEEN FARRELL.
Superior Court of New Jersey, Chancery Division Ocean County.
Decided June 23, 1986.
*295 Joseph Purrazzella for plaintiff (Purrazzella & Purrazzella, attorneys).
Peter Strohm and John Gelson attorneys ad litem (Rothstein, Mandell, Strohm & Gelson, attorneys).
*296 WILEY, J.S.C.
This matter is before the court on an application by plaintiff, Francis Farrell, to be appointed special medical guardian for his wife, Kathleen Farrell, with the express permission to remove a respirator which is, and has been, keeping her alive for the past three years.
Based upon the testimony of Mrs. Farrell, Mr. Farrell, and a number of expert witnesses, the facts present in this case are as follows:
Kathleen Farrell is 37 years old and was married to Francis Farrell on June 28, 1969. The Farrells have two sons, Shawn, age 16, and Brian, age 14. The family lives in a modest home in South Toms River. Prior to 1982 Mrs. Farrell worked for four years as a key punch operator. She began to have trouble with her hand and arm and had to stop working when her condition was tentatively diagnosed as amyotrophic lateral sclerosis, more commonly known as Lou Gehrig's disease. From 1983 on she has been confined to her bed and has progressively lost the use of her arms, legs, and control of her body below her head. She had been a patient in a Philadelphia hospital some three years ago but left because there was nothing that the hospital could do to cure or help her condition. Initially there was little or no pain and Mrs. Farrell said there was hope. Gradually pain set in in her arms and back and she began to lose hope. Mrs. Farrell has been under the treatment of various doctors and is presently being treated by Dr. John Pino, D.O., and Dr. Jean Orost, a psychologist.
A tracheotomy was performed on Mrs. Farrell in the summer of 1983 while at the Hanneman Hospital in Philadelphia, to provide for the insertion of a respiratory tube. This was required because of her inability to breathe without this added mechanical assistance.
Mrs. Farrell presently appears to be a very fragile woman, weighing less than 100 pounds. In December 1982 she weighed 161 pounds. She has no control over her hands, arms, feet or *297 legs, is incontinent as to bowel, and has difficulty with bladder function. She has difficulty in swallowing and is fed liquids, such as fruit juices, with a syringe by nurses who attend to her needs 24 hours a day. She is incapable of taking any solid foods by mouth. She is able to open and close her eyes and can see but has difficulty in talking. During her testimony, a court reporter took down what she said, and her husband at times repeated her answers to questions. Her answers were generally limited to yes or no, and at times an alphabet board was used to be certain her answer was understood. Her mouth tended to fill up with saliva and made her answers difficult to understand at times. When her children and better days were discussed with Mrs. Farrell, her eyes filled with tears and her husband assisted her in blowing her nose. She is incapable of moving her head, neck or any other part of her body. On occasion she is put in a reclining chair and can watch television although she stated she usually falls asleep. She has pain in her arms and back, but medication does relieve it to some extent.
Amyotrophic lateral sclerosis is a disorder of the nervous system which causes degeneration of the body musculature. There is a hardening of portions of the spinal cord resulting in degeneration of the muscles of the body. Since the nerves which run through the spinal cord control all the muscular action of the body, any change or degeneration of these nerve tissues will have a serious damaging affect on the body in general and the muscles in particular. Patients may show signs of emotional problems, but intellectual functions are preserved, even in the terminal phases of the disorder.
The major symptoms are a progressive twitching, with growing weakness and wasting away of the muscles throughout the body. Though usually considered fatal in one to three years, there have been instances of victims having lived for longer periods. The cause of the disease is unknown and there is no known treatment or cure. See Satz v. Perlmutter, 362 So.2d 160 (Fla.App. 1978); see also, Ceil, "Textbook of Medicine," Fishbeins Medical and Health Encyclopedia.
*298 Testimony was taken of Kathleen Farrell on June 16, 1986 at her home. She was questioned by her lawyer, by the lawyer appointed by the court to represent her two minor children and by a psychologist who has worked with her since late 1985, to elicit any testimony as to her competence and understanding of the present proceedings. She answered the questions asked of her responsively. The psychologist indicated that Kathleen Farrell had discussed with her the withdrawing of the respirator since January 1986, and her decision to do so was not the result of a mere whim, or casual decision. She had discussed this with her husband, her two sons, her parents and her sister, and she had no second thoughts about her decision to terminate the respirator. These discussions were an upsetting experience, but there was an open and full discussion among all parties. Her decision was not the result of any depression or temporary mental state, and she did discuss the consequences with a Dr. Sollami, a respiratory specialist. When Mrs. Farrell was asked why she wanted the respirator withdrawn and to let nature take its normal course, she responded "I'm tired of suffering."
Based upon these facts, the applicable legal principles and standards to be followed are those found in the New Jersey Supreme Court's decision in The Matter of Conroy, 98 N.J. 321 (1985). The Conroy decision embodies all of the relevant, up-to-date New Jersey case law involving the withdrawal or withholding of life-sustaining medical treatment.[1] Thus, the extensive analysis provided in Conroy must be followed in making a determination in this case.
In addition to articulating the standards for deciding whether life-sustaining treatment may be withdrawn or withheld from an incompetent patient, the Conroy court also set forth the standards to be followed when analyzing a competent patient's *299 rights to accept or reject medical care. Id. at 346-355. It is logical to conclude, then, that a court must first make a finding as to competency (unless there has already been such an adjudication) before determining whether medical treatment can properly be withheld or withdrawn.
Based upon all of the evidence presented in this case, including expert testimony and the testimony of Mrs. Farrell herself, as previously set forth in this opinion, Mrs. Farrell clearly fits the legal definition of competency, both in a general sense and regarding whether she is competent to make a decision to decline life-sustaining treatment.
New Jersey courts have established that the test for determining a patient's mental capacity to consent to or refuse medical treatment is whether the patient "has sufficient mind to reasonably understand the condition, the nature and effect of the proposed treatment, attendant risks in pursuing the treatment, and not pursuing the treatment." See, e.g., In re Shiller, 148 N.J. Super. 168, 180-81 (Ch.Div. 1977) and cases cited therein.
From the appearance and testimony of Mrs. Kathleen Farrell, the doctors' and psychologist's testimony, and Francis Farrell, it is clear that Kathleen Farrell is totally aware of her surroundings and is able to understand and communicate her will and wishes to other people. She is a competent, adult woman. This conclusion is also consistent with the medical prognosis in this type of illness. In view of this evidence, this patient clearly understands the nature of her condition and that death is almost certain to occur as a result of the disease if the respirator is removed.
Having determined that Mrs. Farrell is competent and possesses the mental capacity to make an informed consensual decision, it is important, then, to follow the Conroy guidelines applicable to such a case.
The New Jersey Supreme Court, along with many other state courts, has clearly stated that "`Every human being of adult *300 years and sound mind has a right to determine what shall be done with his own body.'" Id. 98 N.J. at 346 (quoting Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 129-30 105 N.E. 92, 93 (1914). More specifically, the Conroy court stated that "a competent adult person generally has the right to decline to have any medical treatment initiated or continued." Conroy, 98 N.J. at 347 (citing Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 738, 370 N.E.2d 417, 424 (1977); In re Quackenbush, 156 N.J. Super. 282, 290 (Cty. Ct. 1978)). Such a right is based upon both the common law right to self determination and the federal and state constitutional rights to privacy. Conroy, 98 N.J. at 347-348.
The Conroy Court qualifies these rights, however, by explaining that "the right to decline life-sustaining medical treatment is not absolute ... [i]n some cases, it may yield to countervailing societal interests in sustaining the person's life." The Conroy Court reiterated the four "commonly identified" state interests that may limit a person's right to refuse medical treatment, namely, (1) preserving life, (2) preventing suicide, (3) safeguarding the integrity of the medical profession, and (4) protecting innocent third parties. The Conroy Court cited a number of cases and other sources in which these interests are identified. Id. at 349.
The first state interest, which is to preserve life, has been said to embrace two separate concerns  preserving the life of the particular patient and preserving the sanctity of all life. Id. at 349. The Conroy Court, along with the court in In re Quackenbush, 156 N.J. Super. at 290, stated that where there is no actual or potential life of someone other than the decision maker involved, "the state's indirect and abstract interest in preserving the life of the competent patient generally gives way to the patient's much stronger personal interest in directing the course of his own life." 98 N.J. at 350. The Conroy Court reaffirmed prior court determinations that "insofar as the `sanctity of individual free choice and self-determination *301 [are] fundamental constituents of life,' the value of life may be lessened rather than increased `by the failure to allow a competent human being the right of choice.'" Ibid.; citations omitted.
In the case of Mrs. Farrell, there is no fact or unique situation present that could in any way cause the state interest in preserving life to outweigh her right, as a competent adult, to self-determination, privacy, bodily integrity and the like.
In examining the second state interest, that of preventing suicide, the Conroy Court found that "it is questionable whether it is a distinct state interest worthy of independent consideration," and that "[i]n any event, declining life-sustaining medical treatment may not properly be viewed as an attempt to commit suicide." The Court explained that a patient refusing medical treatment is merely allowing the disease to take its natural course, and that if death were to occur, it would result from the underlying illness, not from a self-inflicted injury. Id. at 351. The terminally ill patient's right to refuse treatment respects the intent not to die, "but to suspend medical intervention at a point consonant with the `individual's view respecting a personally preferred manner of concluding life.'" Ibid.
Since Mrs. Farrell has not expressed any intent to commit suicide or die, but rather has merely asked to terminate treatment and let the disease take its natural course, this state interest should not outweigh Mrs. Farrell's individual rights.
The third state interest, which is to safeguard the integrity of the medical profession, should not be considered an overriding factor in this case given the fact that no hospital, doctor, health care professional, or institution is opposing Mrs. Farrell's decision to terminate life-sustaining medical treatment; thus, there is no real conflict between the patient and the medical profession which might affect its (the medical profession's) integrity. It is important to note that the Supreme Court in Conroy stated that the interest in safeguarding the integrity of the medical profession, "like the interest in preventing suicide, is *302 not particularly threatened by permitting competent patients to refuse life-sustaining medical treatment. Medical ethics do not require medical intervention in disease at all costs." Id. at 352. To force Mrs. Farrell to continue to suffer the horrors this disease has inflicted upon her would be too great a cost to justify medical intervention against this competent patient's wishes.
The fourth and final state interest set forth in Conroy which may override a patient's decision about her medical treatment is the interest in protecting innocent third parties who may be harmed by the patient's treatment decision. Id. at 353. In this case, the only innocent third parties whose interests must be protected are Shawn and Brian Farrell, the patient's two minor sons, aged 14 and 16, respectively. In this case, the two boys were represented by a guardian ad litem who served to protect their interests by opposing Mr. Farrell's application. However, the evidence shows that the two boys, who are emotionally very close to their mother, have agreed to support her decision to terminate the life support system. It appears that these two boys will be well taken care of by their father in the event of their mother's death, be it now, or eventually, as a result of her illness. This case must certainly be distinguished from those where this factor was considered compelling enough to override the competent patient's decision to decline life-sustaining treatment. For example, in John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576 (1971), the New Jersey Supreme Court found that a competent adult could be compelled to submit to a life-saving blood transfusion based upon the compelling state interest of protecting innocent third parties. In that case, the patient was 22 years old, unmarried, pregnant, and likely to live a normal, healthy life if the transfusion were done. The Court there believed the unborn child to be an innocent third party whose interests the State was compelled to protect. See id. at 582-85. All other cases where such a finding was made involved similar or comparable factual scenarios. Here, the Farrell family will soon have to face Mrs. Farrell's death due to *303 the terminal nature of her illness in any event, and the family appears to be prepared for the inevitable occurrence.
The Conroy Court concluded its analysis of these four interests by stating that "[o]n balance, the right to self-determination ordinarily outweighs any countervailing state interests, and competent persons generally are permitted to refuse medical treatment, even at the risk of death." Conroy, 98 N.J. at 353.
Because the facts present in this case clearly do not weigh in favor of the countervailing state interests articulated in Conroy, Mrs. Farrell's right to self-determination must prevail.
It is the exercise of freedom of choice, brought to its ultimate conclusion, that is, whether a competent person, suffering continuous pain, with the ability to control only her eyes or mouth, can decide whether to endure this pain or terminate it. It has already been suggested in the case of In The Matter of Elizabeth Visbeck, an alleged incompetent, decided by Judge Stanton on February 4, 1986, 210 N.J. Super. 527  that worse than the pain itself, is the frustration, bodily insult, and humiliation of having a stranger or some authority decide, contrary to one's own wishes, the quality, the nature, the form, and the manner of one's own future life. This constitutional right of freedom of self-determination, or right of privacy, would be totally subjugated, and defeated if Kathleen Farrell's own clear, concise, and understandable wish were to be ignored and rejected by having this court impose its judgment in place of her will and wish. It would really be adding insult to injury. The right of a competent adult to refuse or terminate medical treatment is a constitutionally guaranteed right which should not be abridged. While the State does have an interest in preserving life, here the quality of the life in question is so poor, so minimal and wracked with pain, that it would be unfair and unjust to force its continuance against the person's wish. Mrs. Farrell's mind, soul and spirit are really imprisoned in a *304 dead body, and to force her to continue to live in this fashion would constitute cruel and unreasonable punishment.
Mrs. Farrell's husband and sons are willing to respect her wish and do not oppose her application to terminate the respirator. Because of her total immobility, she is unable to contribute anything to enrich their lives, and the rights of third parties are thus not really involved.
As noted in Satz v. Perlmutter, supra:
It is our conclusion, therefore, under the facts before us, that when these several public policy interests are weighed against the rights of Mr. Perlmutter, the latter must and should prevail. Abe Perlmutter should be allowed to make his choice to die with dignity, notwithstanding over a dozen legislative failures in this state to adopt suitable legislation in this field.[[2]] It is all very convenient to insist on continuing Mr. Perlmutter's life so that there can be no question of foul play, no resulting civil liability and no possible trespass on medical ethics. However, it is quite another matter to do so at the patient's sole expense and against his competent will, thus inflicting never ending physical torture on his body until the inevitable, but artificially suspended, moment of death. Such a course of conduct invades the patient's constitutional right of privacy, removes his freedom of choice and invades his right to self-determine. [362 So.2d at 164.]
The plaintiff's attorney should prepare a form of judgment consistent with this opinion:
1. declaring that Kathleen Farrell is mentally competent and capable of deciding whether to continue or discontinue any artificial or mechanical life supporting procedures, including disconnection of a respirator to sustain her life;
2. appointing plaintiff, Francis Farrell, her husband, as her guardian ad litem, to carry out the wishes of his wife, with the advice of her treating physician, including the disconnection of the respirator sustaining Kathleen Farrell;
*305 3. ordering that Francis Farrell, or any physician or other person involved in the removal of said respirator from Kathleen Farrell pursuant to the terms of this judgment, will be free from any criminal or civil liability.[3]
NOTES
[1] It has been well established that there is no legal or moral distinction between deciding whether to "withhold" or "withdraw" medical treatment. See, e.g., The Matter of Conroy, 98 N.J. at 369.
[2] It is important to note that the New Jersey Legislature (like Florida), has also failed to enact legislation on this issue thus far, although there are numerous bills dealing with the determination of death and termination of life-sustaining treatment which have been introduced into the State Senate and Assembly. See, e.g., Senate Bill 935, Senate Bill 846, Assembly Bill 269, Assembly Bill 564, Assembly Bill 776, Senate Bill 947, Senate Bill 2387 and Senate Bill 1685; see also, Conroy, 98 N.J. at 344, n. 2.