213 N.J. Super. 475 (1986)
517 A.2d 886
IN THE MATTER OF BEVERLY REQUENA.
Superior Court of New Jersey, Chancery Division Morris County.
September 24, 1986.
*476 Theodore E.B. Einhorn for plaintiff St. Clare's/Riverside Medical Center Inc. (Einhorn, Harris & Platt, attorneys).
James R. Heaney for patient-defendant Beverly Requena.
*477 STANTON, A.J.S.C.
Defendant Beverly Requena is a fully competent 55-year old woman who is dying of amyotrophic lateral sclerosis (ALS). Since April 4, 1985 she has been a patient at St. Clare's/Riverside Medical Center (Hospital). Mrs. Requena's ability to swallow will be totally gone in a very short while. She has notified the Hospital that when she has lost the ability to swallow she will refuse to accept feeding by a nasogastric tube or other artificial device. While recognizing Mrs. Requena's right not to accept artificial feeding, the Hospital asserts a strong institutional policy against participating in the withholding of food or fluids from a patient. It has asked Mrs. Requena to leave the Hospital. She has declined to do so. The Hospital has brought this action to compel the patient to leave the Hospital.
ALS is a disease which involves degeneration and hardening of portions of the spinal cord. It is characterized by progressive loss of control of the muscles of the body and by increasing paralysis. There is no cure for the disease. Its course is relentless. Death within a few years of onset is the inevitable result of ALS. Although the victim progressively loses the ability to control bodily movements and functions, his mind typically remains clear until death.
Beverly Requena was first diagnosed as having ALS in February 1985. On April 4, 1985, she became a patient in the Respiratory Rehabilitation Center of Riverside Hospital in Boonton, New Jersey. (In November or December 1985, Riverside Hospital and St. Clare's Hospital in Denville were consolidated into a new entity known as St. Clare's/Riverside Medical Center, Inc., the plaintiff Hospital. The former St. Clare's Hospital was very much larger than Riverside Hospital. The Roman Catholic religious order of sisters which controlled St. Clare's has ended up as the controlling force of the new entity.) Mrs. Requena has been on a respirator since her arrival at the Hospital. Her condition has deteriorated progressively. She is now completely paralyzed from the neck down. She lost the *478 ability to make sounds in May 1986, although she still has the ability to form words with her lips. Her hearing is failing but is still fairly good. She can understand speech, can read and watch television. Her most common form of active communication is by eye-blink response to questions. (One blink for "Yes," two blinks for "No.") With people who are trained to use them, she can also communicate by alphabet board and by computer. She cannot move her entire head, but she can move her facial muscles.
Mrs. Requena cannot now eat normally. However, she still has some limited ability to suck in nutrient fluids through a straw. That ability will soon be entirely gone. She has already suffered significant nutritional deficits. During the last two weeks she has lost 18 pounds. If artificial feeding through a nasogastric tube or other device is not quickly commenced, Mrs. Requena will probably die within a few weeks or a month. If artificial feeding is undertaken and maintained, Mrs. Requena may live for several years.
Although a person's ability to move is destroyed by ALS, the ability to experience sensation continues throughout the body. The disease itself does not cause pain, but the patient can experience pain from such things as body positioning and contact pressure. Mrs. Requena seems to have significant persistent pain. She is a very bright and aware person whose body has been steadily wasting away during the last 17 months. Her body is now almost totally useless. She is trapped within it. Most understandably, she feels enormous frustration and experiences a pervasive sense of helplessness and hopelessness. Her situation is desperately sad.
Mrs. Requena has always used her natural ability to swallow to its fullest extent. However, she has decided that when her natural ability to swallow has gone, she does not wish to be fed artificially. This decision does not involve any positive act to terminate life. It amounts to acquiescence in the natural shutting down of a critical bodily function. It involves a *479 conscious choice to accept death sooner rather than later. It does not amount either morally or legally to suicide. Many people in Mrs. Requena's position choose to be fed artificially and to prolong their lives. However, given the terribly dire circumstances confronting her, Beverly Requena's decision is readily understandable. I fail to see how an onlooker possessing an acceptable level of human compassion and sensibility could fault her for it. It is absolutely clear that Mrs. Requena has the legal right to make this decision. Matter of Conroy, 98 N.J. 321 (1985); In re Quinlan, 70 N.J. 10 (1976), cert. den. 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); Matter of Visbeck, 210 N.J. Super. 527 (Ch.Div. 1986); In re Farrell, 212 N.J. Super. 294 (Ch.Div. 1986).
Mrs. Requena's decision not to accept artificial feeding is something that she has been thinking about for more than one year. It is not the product of temporary depression. It has been fully articulated and firmly communicated to all interested parties for the past three months. All of the evidence in this case and my own questioning of Mrs. Requena in her hospital room convince me that she fully understands all of the implications of her decision, including the fact that her death by starvation and dehydration may be painful and unpleasant, and that she is voluntarily and knowingly making the decision.
Beverly Requena's decision not to receive artificial feeding is accepted by her treating physicians. It has been supported by her family, which consists of her husband, three adult children and a number of grandchildren. When the decision was first communicated to the Hospital's management on July 15, 1986, the Hospital immediately responded that the decision conflicted with its "pro-life" values which included a refusal on the part of the Hospital and its personnel to participate in the withholding of artificial feeding. As the parties have focused more sharply on the issues involved, various internal institutional bodies and officers of the Hospital have considered and reasserted its position on this matter. On September 11, 1986, the board of *480 trustees of the Hospital unanimously adopted the following resolution:
BE IT RESOLVED by the Board of Trustees that it does hereby reaffirm the policy of the former St. Clare's Hospital that food and water are basic human needs and that such fundamental care cannot be withheld from patients in the Medical Center and that neither the Medical Center nor personnel will participate in the withholding or withdrawal of artificial feeding and/or fluids.
While asserting its own policy, the Hospital has readily recognized the right of Beverly Requena to decline artificial feeding. It has offered to assist her in transferring to another institution. There is a pulmonary and respiratory care unit at St. Barnabas Hospital in Livingston which is willing to receive Mrs. Requena as a patient and to accept her decision not to be fed artificially. Dr. Fred Jacobs, one of Mrs. Requena's treating physicians at the Hospital, is also on the staff at St. Barnabas and would continue to serve as her treating physician there. The safe transporting of Mrs. Requena from the Hospital to St. Barnabas, a distance of about 17 miles, is something which can be easily accomplished. The facilities and treatment skills available at St. Barnabas are equal to what the patient is presently receiving at the Hospital. It is anticipated that the care of Mrs. Requena at St. Barnabas would be supportive and compassionate. It would be somewhat more difficult for her family to travel to St. Barnabas, but this is not a significant factor because the family members will be able to make travel arrangements and will continue to visit Mrs. Requena frequently.
On its face, the proposed transfer of Mrs. Requena to St. Barnabas would seem to be an ideal solution to the problems presented by this case. It would fully respect both the patient's desire not to be fed artificially and the Hospital's desire not to participate in the withholding of such feeding. It would also provide good medical care for the patient during the final stages of her illness. However, Mrs. Requena does not want to leave the Hospital. During her 17-month stay at the Hospital, she has received care which is both professionally good and personally compassionate. She has developed trust in and *481 affection for the nurses, the respiratory technicians and the other staff members at the Hospital. She is familiar with the physical surroundings. It would be emotionally and psychologically upsetting to be forced to leave the Hospital. The removal would also have significant elements of rejection and casting out which would be burdensome for Mrs. Requena.
I note here that there is no element of personal animus involved in the Hospital's bringing of this action for removal. When it was unable to persuade Mrs. Requena to move to another institution in order to implement her feeding decision, the Hospital instituted this civil action on September 8, 1986. Because of the medical exigencies of the situation, the case was quickly brought on for trial on September 22 and 23 and final decision is being rendered on September 24. From July 15, 1986 (the date on which she informed the Hospital of her feeding decision) until the present, Mrs. Requena has been treated with respect, skill and compassion by all employees of the Hospital. The fact that Mrs. Requena so very much wants to stay at the Hospital is an eloquent tribute to the quality and the decency of the care she has received. I also note that this total situation involves considerable psychological and emotional burdens for treating staff members, as well as for Mrs. Requena. I am not speaking here of the usual burden experienced by these health care providers as they watch their terminally ill patients die. There is a special burden and frustration here which arises from the fact that Mrs. Requena is not accepting the full range of treatment available and that she is perceived as refusing to accept even basic life support.
During the course of this trial, three psychiatrists and a number of other witnesses have testified about the emotional impact which this situation is having upon its participants. Three of the treating nurses testified about the special strain they are already experiencing as they care for Mrs. Requena. They anticipate increasing stress when she completely loses the ability to swallow and visibly starves. The professionalism of these nurses is such, and their commitment to loving care for *482 their patients is such, that all of them have indicated that they will continue to serve Mrs. Requena if she remains at the Hospital, but there is no doubt that they will be sorely stressed. The elements of human feelings involved on all sides of this case are very sensitive and very difficult to sort out.
Many of the witnesses in this case have observed the death of patients. Sometimes they have treated patients whose diseases are such that at their terminal stages their bodies have been unable to process food or liquid effectively, even if food and liquid are introduced into the body. They have dealt with dying patients who have coincidentally suffered from malnutrition and dehydration. None of the witnesses have ever dealt with a patient for whom malnutrition and dehydration have been so large a factor as they will be in the death of Mrs. Requena. Consequently, none of the witnesses (and this includes all of the medical expert witnesses) have been able to predict very reliably how much pain and discomfort the dying process will entail for Mrs. Requena. The best understanding that I can derive from the evidence is that during the first week or two after she has completely lost the ability to swallow she will suffer rather intense discomfort and pain from the effects of dehydration. After that, she will probably slip into deepening unconsciousness and will lose much, and then all, of her awareness of pain, until finally she dies. It is a harsh prospect for her and for those taking care of her.
On the other hand, given the relentless progress of her ALS, even if Mrs. Requena were to solve her nutritional problems by accepting artificial feeding, she has nothing much to look forward to in this life. She will continue to live within a useless body with the attendant pain, feelings of frustration, helplessness and hopelessness. In a year or two, she will waste away and die. The natural failure of Mrs. Requena's ability to swallow as a result of ALS now gives her the ghastly choice between a protracted wasting death and a much faster and perhaps more intensively painful death. She is making this choice against a background of 17 months of having suffered *483 the dire effects of ALS. Beverly Requena chooses to accept the earlier death. In my judgment, this choice is a fully valid one, both morally and legally.
There is no good outcome to this case. Regardless of any decision made by me or by anybody else, one way or another, in one place or another, Beverly Requena will die an unpleasant death in the relatively near future. Going to St. Barnabas Hospital is a realistic alternative. But if Mrs. Requena goes there, she will experience extra suffering over and above the grim suffering necessarily inherent in her disease and in her choice of no artificial feeding. Requiring the Hospital to continue to care for Mrs. Requena even though she does not accept artificial feeding is also a real alternative. However, that would entail significant judicial interference with the policies of the Hospital and that would impose special burdens upon individual health care employees of the Hospital.
My decision is that Beverly Requena may not be removed from the Hospital without her consent. She may remain in the Hospital until her death. Her decision not to accept artificial feeding must be honored by the Hospital. I know that while she remains in the Hospital all of its employees will treat her with professional skill and with kindness  no order is necessary in that regard.
As I give the reasons for my decision in this case, I will at some points be critical of the Hospital and its management. That criticism must be viewed against the background of my keen awareness of the noble tradition of skilled and caring service rendered to the people of our community by the Hospital. I respect and admire the work, the motivation and the general values of the Hospital and its personnel.
It seems to me that the key moral and legal value involved in this case is the personal worth, dignity and integrity of the individual human being who happens to be a patient. The right to make informed, autonomous decisions about one's own treatment is a crucial part of that personal worth, dignity *484 and integrity. In the context of this case, this means that Beverly Requena, and she alone, has the right to decide what treatment she will receive. Health care providers must assist her in making her decision by supplying her with information about her condition, her prognosis, her treatment alternatives. They may and should counsel her and caution her with respect to her decision. But in the end, the decision must be hers alone and it must be uncoerced. The moral and legal right of the patient to decide for herself has been firmly recognized by the New Jersey Supreme Court in Matter of Conroy, supra, and In re Quinlan, supra. It has also been recognized by courts throughout the United States and by The President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research as embodied in its report entitled Deciding To Forego Life Sustaining Treatment, Ethical, Medical and Legal Issues in Treatment Decisions (1983). There are limitations on a patient's right to choose, but none of them are applicable here. The treatment decision being made by Mrs. Requena is reasonable and understandable. It most certainly is not bizarre.
The policy of the Hospital in this case is not intended to interfere with Mrs. Requena's right to decide. Indeed, it is the specific intent of the Hospital to avoid such interference. However, I find that under the total circumstances of this case the policy is, in fact, coercive. I think that Mrs. Requena's resolve is so strong and her spirit is so durable that she will not be coerced. The point, however, is that she should not be subjected to the coercion. In our concrete case, the Hospital's policy must yield.
One of the problems in the case before me is that there has been a tendency on the part of the Hospital to find a "pro-life" versus "anti-life" issue where one does not truly exist. As a starting proposition, we all want to live for an indefinitely long period of time. But there comes a time when each of us must die. For many of us, there comes a time when it is right to consciously accept death and to surrender to the dying process. *485 That time has come for Beverly Requena. This poor woman is not anti-life and her decision is not anti-life. She would dearly like to be well and to have a decent life. Unfortunately, a decent life is not hers to have. She has suffered much. It simply is not wrong in any sense for this good woman to want relief from her suffering. Hospitals and health care providers do not deal with life in the abstract. They deal with living people. Eventually, all those living people become dying people, and those people must be dealt with in a way which fully respects their dignity, including as part of that dignity the right to choose one's treatment.
At times during the trial, either in live testimony or in documentary evidence, various representatives of the Hospital have spoken of the wrongness of denying food or water to a patient. They have also referred to the need for all patients and potential patients of the Hospital to be absolutely assured that they would never be harmed by the Hospital or any of its personnel while undergoing care. Nobody questions those concepts. Of course, they are an essential part of the integrity of any health care institution. But they are not implicated in this case. "Denial" of food connotes a refusal to give food to someone who wants it. Honoring Beverly Requena's request not to be fed artificially is not denying her anything. It is not an infliction of harm upon her by the Hospital. On the contrary, it is recognizing her dignity and worth as a human being. Properly understood, it has no adverse implication for general patient care or for public confidence in the Hospital and its staff.
It seems to me that a distinction should be made between natural feeding and artificial feeding. For a person to eat or drink in the usual way, either entirely under her own power or with the manual assistance of others, is part of the normal routine of living. For a person to receive food and *486 liquid through a nasogastric tube or through a comparable artificial feeding device is not part of the normal routine of living. It is medical treatment. From a technical point of view, it is frequently rather simple medical treatment, but it is medical treatment. It is medical treatment just as much as is the taking of antibiotics or as is the use of a respirator. A patient has the same right of decision-making with respect to it as she has with respect to other forms of medical treatment. See Matter of Conroy, supra, 98 N.J. at 372-373. When a patient loses the ability to swallow as part of a disease process, the decision to insert a feeding tube is a definite medical treatment decision made to resist the progress of the disease and to prolong life by artificial mechanical means. Very frequently, it is an obviously correct decision which would readily be made by almost every patient. It is not, however, a decision which is obviously correct in all cases.
I suspect that part of the Hospital's insistence on what it perceives as a pro-life position in this case is a mistaken fall-out from the abortion controversy which is ongoing in our society. The Hospital, whose values are premised as they are on the loving care of people, naturally (and, I think, properly) views abortion as a terrible evil. But abortion involves the active, direct, intentional termination of life by interfering in the processes of nature. The life taken is usually perfectly healthy. The fetus does not in any sense consent to what is done to it. None of those elements are present in Mrs. Requena's case. There is no sensible comparison to be drawn between the two situations.
I note again that Mrs. Requena's treating physicians accept her decision and intend to continue serving her. In reaching its policy decisions about Mrs. Requena, the Hospital has not even consulted, much less seriously considered, the views of the treating physicians. Furthermore, it apparently has not in any organized, comprehensive way involved its medical staff in *487 developing its general ethical rules, although a few persons who are physicians have participated in the ethical decision-making process. The Hospital is entitled to have institutional policies which are somewhat distinct from the views of its medical staff. But a process for making ethical policy decisions for a hospital which does not meaningfully include the medical staff is seriously flawed. A process for making specific ethical decisions which does not even take into account the views of the treating physicians directly involved with the individual patient whose care is under consideration is even more seriously flawed. The reality is that treating physicians in particular and the medical staff in general must be included in these institutional decisions if they are to be reliable and sound.
I am somewhat concerned that there is completely unintended but real moral rejection of Mrs. Requena as a person by the Hospital and some of its staff. In unconscious ways, some of the management and treating personnel are being inappropriately judgmental. They are, in effect, telling this poor woman that it is wrong for her not to accept more suffering. Beverly Requena is sorely tried by her ordeal. Putting her out of the Hospital would be a hard psychological and emotional blow to her.
Beverly Requena has little to look forward to on this earth. Part of the little she has is the comfort she takes from the physical surroundings of the Hospital and the care of the good people who work there. It is true that she would get good care at St. Barnabas, but it would not have the same reassuring quality that she gets from the familiar surroundings and the familiar people at the Hospital. It simply would not be decent to force this fully conscious and sensitive human being to leave. (I note that, among other things, the consciousness and sensitivity of our patient readily distinguish the present case from Brophy v. New England Sinai Hospital, Inc., 398 *488 Mass. 417, 497 N.E.2d 626 (1986) and from Matter of Jobes, 210 N.J. Super. 543 (Ch.Div. 1986).
I realize that by keeping Mrs. Requena in the Hospital I will be imposing a real burden on its nurses and technicians. I do not like to do that. But they are well and whole people. They have full and vibrant lives ahead of them. In the final analysis, it is fairer to ask them to give than it is to ask Beverly Requena to give. Also, I suggest, with deference, that by rethinking more carefully their own attitudes, the health care workers at the Hospital might find it possible to be more fully accepting and supportive of Mrs. Requena's decision. If they were able to do that, I think that some of the special stress of this situation might disappear.
As counsel for plaintiff Hospital has correctly pointed out in his legal arguments, judges in New Jersey are generally expected to defer to the policy decisions of hospital managers and governing bodies. However, judges should not defer to hospital decisions which are unreasonable or which improperly burden patients or impair patient rights. My judgment on all the facts of this case is that judicial intervention is fully warranted.
I have spent some considerable time explaining the reasons for my decision in terms which I hope will be understandable and, perhaps, cogent to the Hospital management and staff. I have done that because I hope that the decision will not be viewed as an officious intrusion into the affairs of the Hospital. I would like to see the Hospital and its people view this case as a chance to give special care with surpassing kindness to a most needful sister of ours. As manifested by the evidence in this case, the Hospital rejoices in its specifically Christian heritage. Perhaps it would not be amiss to ask the health care workers at the Hospital, as they turn with loving compassion to the work of helping Beverly Requena, to recall the beautiful words of Jesus: "Come to me, all you who are weary and find life burdensome, and I will refresh you." (Matthew 11:28).