## In re Jane Doe

*Leonard Zack,* for Jane Doe.

*Brian M. Peters,* for hospital and attending physician.

*Neal D. Colton,* for attending physician.

LEHRER, *J.*, August 19, 1987—This court will enter a declaratory judgment pursuant to the Declaratory Judgments Act. Pa.C.S. §§7531-7541 (Purdon, 1978).

The issue before it is justiciable. It involves balancing the common law and constitutional right to self-determination and privacy against the interest of the state in the preservation of life. All necessary and indispensable parties have been and are named of record.

The issue arose from the following operative facts: An adult, mature competent woman has been a patient in a hospital since January 21, 1987. She suffers from Amyotrophic Lateral Sclerosis, commonly referred to as Lou Gehrig's Disease. The disease is a continual march towards total paralysis and death.

On June 19, 1987, the patient, her family and counsel retained by patient's family at her request,

asked her primary attending physician and the hospital to remove life sustaining support systems. The hospital and the physician, after a month of careful reflection, made it clear that while willing to accede to the patient's wish, neither would do so without what each considered an appropriate judgment or order of the court.

On July 20, 1987, the patient filed a motion for discontinuation of a mechanical ventilator with the patient as (specifically named) petitioner and the hospital and principal attending physician as (specifically named) respondents praying the court, in effect, to order the hospital and physician to accede to her wish and to remove the ventilator.

The court, after lengthy in-chamber colloquy with counsel for these parties, entered a rule on the hospital and principal attending physician to show cause why such relief should not be granted. At the same time, the court, sua sponte, on the face of the same petition, issued a rule on the attorney general of this commonwealth to appear similarly and to show cause why the relief should not be granted.

Pursuant to the rule, testimony was taken on three different days: two in closed court and one at the patient's hospital bedside. Extensive briefs were filed and arguments heard. On motion of the hospital concurred in by the others, the record was impounded and the court closed its proceedings to respect the privacy of the patient and her family.

Thus, the caption of the case is styled "In re Jane Doe" and this opinion bears such caption. However, because this is a case of first impression in this commonwealth and of wide interest to the medical profession the opinion herein will not be shielded as will the record and pleadings.

Based on the testimony, pleadings, briefs and arguments of counsel, the court makes the following

## FINDINGS OF FACT

(1) Petitioner Jane Doe is a 64-year-old woman. She is afflicted with Amyotrophic Lateral Sclerosis. She is a widow; her husband died 10 years ago. She has four adult children and seven grandchildren. The children have described her and the court finds her to be a strong, independent and caring woman who tended to her home, her husband and children in better years. In the previous 10 years she has suffered several medical problems including a gastrectomy, nephrectomy and massive myocardial infarction. Although she had symptoms of ALS for several years, she was diagnosed definitively in March 1986. Thereafter, the disease progressed rapidly.

(2) ALS is a degenerative disease which affects the function of various types of nerves,[1] which leads to the progressive loss of function of body musculature except the eyes. ALS affects the movement of the arms, legs, and head, the coordination necessary to cough, to swallow and to talk. ALS becomes a pulmonary disease as it begins to affect the vital functions of breathing. The muscles of the diaphragm and the muscles between the ribs that allow the bellows function of the chest to proceed for the intake and exhalation of air become atrophied and cease to function. In the later stages of ALS, a patient requires a nasogastric feeding tube and becomes ventilator-dependent.

(3) The prognosis is death in approximately three years from onset without life-sustaining intervention. Life is prolonged with intervention. The longest reported case of a patient afflicted with ALS

---

1. The upper and lower motor neurons are affected. The upper motor neuron is a type of nerve affected in the common stroke. The lower motor neuron is the type of nerve affected in polio.

on a ventilator is 11 years.

(4) The ventilator and feeding tubes are modalities of medical treatment. They prolong the dying process. They neither arrest the underlying disease's deterioration nor impede its process.

(5) Extensive research has been conducted into the cause of this disease: viral, allergic and environmental, yet its etiology remains unknown. There is no effective treatment, nor cure. The patient's mental acuity and intelligence remains intact. Difficulty and frustration to the victim arises not only from increasing paralysis, but also in attempting to communicate. In a sense the patients become locked-in to his or her own mind.

(6) Some time during 1986 the patient lost the ability to speak. Next, she lost use of her legs and arms. By October 1986, she was confined to a wheelchair. On January 15, 1987, she was treated in a hospital emergency room for shortness of breath and choking on her own secretions. Thereafter, she was admitted into the hospital on January 21, 1987. A surgical procedure was necessary to insert a nasogastric feeding tube. During this procedure, a breathing tube was inserted due to the effect of the sedation relative to her respiratory drive. The breathing tube was removed on January 23, 1987. Nevertheless, she was placed on the ventilator the next day due to an inability to breathe. She developed other complications: pneumonia, partial and total lung collapse, unstable blood pressure and irregular heart rhythm. Later, when she stabilized, an attempt was undertaken to wean her off the ventilator in increasing time intervals. This proved unsuccessful and all attempts to do so were discontinued in early April 1987. She can no longer sustain life off of the ventilator.

(7) On February 7, 1987, she advised her physician of her wish for her full "code" status to be changed to "no-code." She was informed and understood the ramifications thereof; to wit, that if her heart were to stop, the resuscitation team would not try to revive her, nor would antibiotics be administered if an infection set in.

(8) The patient is totally immobile except for the following: her eyes; the ability to move her head in a one-inch radius from a lateral rested position; and movement in the right index finger with which she can "write" by forming letters on the bed sheet (by so doing, she can communicate by spelling out words). The remaining parts of her body are near total paralysis. Within 60 days she will lose the remaining use of her finger and the movement of her head. Her intelligence will remain intact. Her only means of communication will be the gleam, intelligence and voice of her eyes. Ultrasophisticated electronic systems to aid communication are available, but are of doubtful efficiency. They pick up subtle impulses from the movement of the eyeballs which activate a preprogrammed set of words. Such will be the quality of life she would endure.

(9) Jane Doe (1) understands her current condition, (2) is able to make an independent decision about her welfare and medical treatment, (3) understands what will happen if her current condition goes untreated, (4) understands what the current and proposed treatment consists of, (5) understands the complications, risks and benefits of all proposed available treatment, and (6) finally, she has the ability to perceive the world with a sense of reality, think clearly and make judgments concerning all of the above considerations, with neither an abnormally depressed nor an abnormally elevated mood, all of

which is characteristic of the average reasonably mentally healthy person.

(10) Jane Doe is competent to decide on the removal of the life sustaining support systems. Her choice to withdraw the mechanical ventilator is an informed and independent decision made in full awareness of the consequences, to wit, that the termination of the ventilator will most -probably end her life within one hour. She is capable of considering and assimilating rationally not only the physical consequences and implications of her choice, but also the emotional consequences and implications of her choice on both herself and her loved ones.

(11) The hospital's internal administrative procedures were invoked in the instant case and the Hospital Ethics Committee, composed of medical and nonmedical staff, concur with the primary attending physician's decision to honor the patient's autonomy and the patient's right to control the termination of the ventilator. Such conclusion is consistent with the American Medical Association's standard of medical ethics, infra, and the letter and spirit of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, infra.

(12) All four adult children agree with their mother's decision and join in the petition. Each is well beyond the age of maturity, all are married or engaged and two are parents themselves.

## DISCUSSION

### A.

(1) This court will enter an order in the form of a declaratory judgment pursuant to the Declaratory Judgments Act. See 42 Pa.C.S. §§7531-7541 (Purdon, 1978). The court has the power to enter a

declaratory judgment in any civil proceeding, suit, or action no matter how commenced where all parties to be affected are actually in court or given the opportunity to be heard and where the court is convinced that such a judgment is appropriate and proper to be entered. See *DiLoreto v. Marsidell Inc.*, 46 Erie 128, 13 Fiduciary 614 (1964).

The petitioner, in her prayer, asked the court, in effect, to order the hospital to allow petitioner to remain in the hospital free of the respirator-ventilator, in effect, to order the hospital to remove the respirator-ventilator. The hospital, on the other hand, orally before the court urged the court to do no more than make findings of fact and conclusions of law applicable to the case, in the style of the cases in New Jersey and Florida, infra. The issue so framed is in substance, therefore, one in declaratory judgment.

When the initial motion for discontinuation was presented to the court (as previously noted), this court wrote on the face thereof:

"It is further ordered that the attorney general of the commonwealth of Pennsylvania shall be served with a copy of this petition and rule and is hereby *given leave* to appear and show cause both to the substance of the relief sought herein and as to its standing to so show." (emphasis added).

The attorney general was served.

On the appointed return date, a regional chief deputy attorney general appeared before the bar of the court. She advised the court that the "attorney general has been made personally aware of this petition and the contents of the petition before the court . . . we will not enter our appearance. If the facts of the petition are as they are, and they develop so on the record, we will not lodge any objection to the court's order . . . we are simply here as observers."

She attended only one morning session and departed.

The district attorney of Philadelphia sent word through counsel for the hospital that the district attorney was advised of the petition by the attorney general but would also not appear nor seek to be heard because "they are a criminal body that investigates after the fact and would not get involved in rendering any sort of advisory opinions de facto or otherwise."

The attorney general (or the local district attorney) is the representative of the people of this commonwealth for the expression of the state interests which are the subject matter of the petition served on it.

Article 4, section 4.1 of the Pennsylvania Constitution establishes the office of the attorney general and declares him to be the chief law officer of this commonwealth, who shall exercise all the responsibilities as shall be provided by law.

The Commonwealth Attorney's Act, 71 Purdon §732-101, et seq., similarly designates him as the chief law enforcement officer of the commonwealth and sets forth his powers.

The power to represent the commonwealth in a declaratory judgment suit of the nature involved herein is implicit in his power as prescribed to him by that statute.

The Legislature cannot be presumed to have denied the attorney general that power. The issue here has statewide implications involving questions of public policy which transcend the county level. Section 732-201, et seq., must particularly so be construed in light of the designation of the attoney general as a constitutional officer. Article 1, section 1 of the Pennsylvania Constitution declares that the inherent rights of mankind include, inter alia, enjoy-

ing and defending life and liberty. In any event, the order to be entered in this case will not become final until after the attorney general, district attorney and all other parties are given an opportunity to appear to argue or otherwise show cause why it should not.

The standing of the attorney general and/or the district attorney to be heard in this case is clear and obvious within the four corners of the pleadings served on him. He not only has the right to be heard, he has a duty to do so.

This court therefore holds that the attorney general is a named party to this action in the same force and substance had he been literally named as a party in the caption of the original pleading and had the pleading been originally styled as one in declaratory judgment.

(2) The case presented before this court is justiciable. The test for the presence of a "case or controversy" is whether there is an issue appropriate for judicial determination. See *President and Directors of Georgetown College Inc.*, 331 F.2d 1000, reh'g denied, 331 F.2d 1010 (1964).

A case or controversy exists when a decree may be entered of a conclusive character as distinguished from rendering an advisory opinion upon a hypothetical state of facts. The facts call for a judicial judgment of a conclusive character for two compelling reasons. One is to guarantee the individual rights and personal dignity of Jane Doe. The other is that her vital rights are intermingled with the public interest and the interest of liberating physicians and hospitals "from the shackles of the subtle influences of self-interest and self-protection in exercising independent medical judgments." See *In the Matter of Quinlan*, 70 N.J. 10, 355 A.2d 647 (1976) (termi-

nation of a respirator of a noncognitive person).[2]

Herein, Jane Doe's common law right of self-determination and constitutional right to privacy were being denied and will continue to be denied without court intervention. This is despite the fact that the parties appeared to be nonadversarial. Nor is it any less nonadversarial, nor is court intervention less required to guarantee Jane Doe's rights because the attorney general apparently presented no objections to the positions taken by the other parties.

Physicians and hospitals must be free of fears of potential criminal prosecution and civil suit and not allow such influences to affect their professional judgment in the physician-patient relationship.

The court is advised by counsel for the hospital and the physician that the medical community is aware of this case (though not necessarily the identity of the parties) and awaits the law it might render. There is no reason to discount this representation.

In other jurisdictions, the highest appellate courts have deemed the issue of the right of a competent adult to refuse further treatment to be of such public interest that the death of the patient did not moot the appeal and those courts decided the appeals with opinions of precedential substance. *Satz v. Perlmutter*, infra.

The hospital, herein, does not want to appear to be opposing Jane Doe's request and seems to be apologetic for forcing Jane Doe to court. It need not apologize. It is performing a public service by giving the people of this commonwealth an opportunity for a judicial judgment.

--------

2. The celebrated *Quinlan* case also involved an order in the form of declaratory relief.

## B.

Scientific advancements have prolonged life in many instances, while doing nothing to sustain the quality of that life. This fact, which is common knowledge; has raised legal issues and given need for legal intervention. Legislatures are often slow to act, and where the legislature has failed to act, the courts must respond to protect individual rights.[3]

This is a case of first impression in this commonwealth. However, other jurisdictions, most notably Florida and New Jersey, have established rules of law with which this court concurs. In some, the facts are virtually identical to those here.

First, the case law is clear that the right of a competent individual to refuse medical care or to have it withdrawn is a right under the common law doctrine of self-determination and a constitutional right of privacy. See *Union Pacific Railway Co. v. Botsford*, 141 U.S., 734 (1981) (the individual right to self-determination recognized at common law); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (right of privacy arises from the penumbras of specific guarantees in the bill of rights); *Roe v. Wade*, 410 U.S. 113 (1973) (right of privacy extended to a

---

3. The 1985-86 session of the Pennsylvania General Assembly saw the introduction of the following bills: S.1110, session (1985) (bill titled "Medical Treatment Decision Act" passed in Senate, referred to the House Health and Welfare Committee); S. 1270, session (1985) (bill titled "Natural Death Act," allowing withdrawal of life sustaining procedures); H.R. 1487, session (1985) (bill similar in scope to Senate Bill 1110). Hence, one bill passed in one chamber, the other bills passed neither chamber.

In the 1987 session of the Senate, bill 210 (similarly titled) was introduced on January 28, 1987, passed the Senate April 28, 1987, and remains in committee in the House of Representatives since May 4, 1987.

woman's decision to abort a pregnancy); *Foody v. Manchester Memorial Hospital,* 40 Conn. Sup. 127, 482 A.2d 713 (1984) (recognition of a semi-comatose patient's right to decide to terminate an artificial life-sustaining treatment). A physician/patient relation is a consensual one and where a physician renders services in the absence of informed consent, there is an actionable tort under the theory of battery. See *Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966).

Indeed, it has been held that there is a cause of action for battery where a physician or hospital has not honored a request of a competent individual to have support systems removed. See *Estate of Leach v. Shapiro,* 13 Ohio App. 3d 393, 469 N.E. 2d 1047 (1984).

In *In re Yetta Maida,* 62 D.&C.2d 615 (1972), a Northampton County Common Pleas Court recognized the right of a competent adult to reject or withhold medical treatment. The right to reject medical treatment therefore must carry a concomitant right to discontinue or withdraw medical treatment.

Many cases brought to the court's attention by counsel and which the court itself has uncovered have involved a plaintiff petitioner on behalf of an incompetent patient. See *Foody,* 482 A.2d 713; *Saikewicz,* 370 N.E. 2d 417; *Quinlan,* 70 N.J. 10; *Quackenbush,* 156 N.J. Super. 282 (an alleged incompetent found competent). The courts there struggled to ascertain the will or choice of the individual had that person been able to speak. This court has been spared that difficulty.

Jane Doe is competent. Her decision to discontinue the mechanical ventilator is a long-standing one. As early as the time of her diagnosis, she expressed her wish not to be kept alive by artificial means.

However, whether the patient is competent or incompetent, the ultimate task for the court is the same, to apply the following rule of law, to wit:

"[T]he right of a person to have medical treatment discontinued is not an absolute one, but is subject to four state interests in (1) the preservation of life, (2) the right of innocent third parties such as dependent minors, (3) the prevention of suicide, and (4) the maintenance of the integrity and ethics of the medical profession. See *Bouvia v. Superior Court,* 179 Cal. App. 3d 1127, 225 Cal. Rptr. 297 (1986); *Satz v. Perlmutter,* 362 So. 2d 160 (1978), aff'd, 379 So. 2d 359 (1980); *Superintendent of Belchertown v. Saikewicz,* 373 Mass. 728, 370 N.E. 2d 417 (1977); *In the Matter of Quinlan,* 70 N.J. 10, 355 A.2d 647 (1976), cert. den., 429 U.S. 922; *Matter of Quackenbush,* 156 N.J.Super. 282, 383 A.2d 785 (1978); *In the Matter of Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985); *In the Matter of Requena,* 213 N.J.Super. 475, 517 A.2d 886 (1986), aff'd, 517 A.2d 869; *In the Matter of Farrell,* 212 N.J.Super. 294, 514 A.2d 1342 (1986); *In the Matter of Nancy Ellen Jobes,* No. 1-108, A-109, Slip Op. (June 24, 1987), cert. den., (U.S.      ) (     ) (the most recent publicized case confronting the issue of removal of feeding tubes for a comatose patient).

Applying that rule to the facts of this case, this court holds that Jane Doe's right to self-determination and privacy outweighs any countervailing state interest.

## C.

The *Satz* case had virtually identical facts to this case. Mr. Perlmutter was suffering from ALS. The state's attorney opposed the termination of his ventilator arguing that such a deed would be a violation

of the Florida Criminal Statutes against homicide and suicide. The trial court and the Florida Supreme Court rejected this notion. A declaratory judgment ruled that there was no criminal liability on the part of those adhering to Mr. Perlmutter's request.[4]

Moreover, it declared no civil liability on the part of any person who acted in conformity with its opinion and order. One might arguably attempt to distinguish the case at bar from the *Satz* case by virtue of the testimony that Jane Doe might continue to live for several years, while Mr. Satz was not expected to live more than four months with support systems. However, the disease is terminal and the process of dying is relentless and irrevocable. The ventilator is less life-sustaining and more an artificial prolongation of the dying process. Jane Doe is dying. What is occurring is an artificial prolongation of that process. The continuous ongoing paralysis of every muscle in her body is the core of that dying process. The quality of her life is gone before her heart ceases to beat or there is no longer a brain wave.

The cases which have sustained the interest of the state in preserving or sustaining life over the wishes or choice of the patient or his surrogate and have ordered or compelled medical treatment have involved emergency situations. See *In re Estate of Dorone,* 349 Pa. Super. 59, 502 A.2d 1271 (1985) (full life expectancy after transfusions for a Jehovah's Witness were ordered); *President and Directors of Georgetown College Inc.,* 331 F.2d 1000 (1964) (blood transfusions ordered for a Jehovah's Witness, who refused on religious grounds, due to

---

4. At one point, Mr. Perlmutter disconnected it himself, but it was reinserted by nurses.

the overriding state interest in protecting innocent minor child).

The state's interest in the preservation of life weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims. See *In the Matter of Requena*, 213 N.J. Super. 475, 517 A.2d 886, aff'd 517 A.2d 869 (1986). Here, the bodily invasion of Jane Doe is great. She requires 24-hour nursing care, feeding tubes, mechanical ventilator and a catheter.

The use of feeding and breathing modalities is not normal living; it is not life per se, but medical treatment. See *In the Matter of Requena*, supra.

*In the Matter of Kathleen Farrell*, supra, the facts are also almost identical to those in this case. There, Mrs. Farrell's husband applied to the court to be appointed special guardian for his wife who had ALS with express permission to remove the respirator. Kathleen Farrell was, nonetheless, competent to make a choice herself. In such manner was the issue framed. Kathleen Farrell was 37 years old with two sons, ages 16 and 14. The recitation of the facts of her illness and condition are identical to those here. There, the rights of the minor children to have their mother live as long as possible did not bar the superior nature of Kathleen Farrell's right to self-determination and right to privacy. The minor children in *Farrell* were supportive of their mother's decision. The adult children herein are similarly supportive and have so stated.[5]

All of the above cases specifically declared and/or held that the removal of life support systems not to

---

5. Jane Doe has no material estate. The medical bills are paid by insurance and state assistance grants. The mother has advised the children to be strong, and the children adhere to their mother's wish due to their deep respect and love for her.

be a violation of that state' s homicide and/or suicide criminal codes. See inter alia, *Foody v. Manchester Memorial Hospital*, 482 A.2d 713 (1984); *In re Quinlan*, 70 N.J. 10; *Bouvia v. Superior Court*, 179 Cal. Appl. 3d 1127, 225 Cal. Rptr. 297 (1986).

Suicide by definition is "the voluntary and intentional killing of one's self." Black's Law Dictionary, (Fifth Edition, 1979). The Pennsylvania Crimes Code has virtually the same definition. *Satz* and *Farrell* specifically held death came in those instances not as a result of self-infliction, but the result of the underlying disease. If death comes to Jane Doe when the ventilator is terminated, it is as a result of the underlying disease. "There is a difference between self-infliction or self-destruction and self-determination." See *Conroy*, 486 A.2d 1209, Jane Doe does not harbor a specific intent to die. She told this court, "I want to rest." These facts preclude the refusal of treatment classed as attempted suicide. See *Satz*, 362 So. 2d 160.

"Worse than the agony of such a life is the frustration, bodily insult and the humiliation of having a stranger or some other authority decide contrary to one's own wishes the quality, the nature, the form and the manner of one's own future life." *In re Farrell*, at 1346.

Finally, it must be noted that adherence to Jane Doe's wishes is consistent with the ethics of the medical profession. See AMA Council on Ethical and Judicial Affairs (March 15, 1986); President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Deciding to Forego Life-Sustaining Treatment* (March 1983) (a report on the ethical, medical and legal issues in treatment decisions).

## D.

Both the attending physician and the hospital ethics committee concur with discontinuing the life support systems to honor the patient's autonomy and personal dignity. When Jane Doe's ventilator is, discontinued she will experience pain and/or anxiety over the apprehension of pain, unless she is first (or simultaneously) given doses of pain and anxiety relieving medications. Such medications are administered routinely to terminally ill patients suffering acute pain and anxiety. Jane Doe has expressed certain wishes as to methodology: that she experience no pain and that she not be told of the precise moment when the ventilator is discontinued.

One of her attending physicians prefers to tell her that the moment of discontinuance is at hand; another of her attending physicians has no preference. In either event, whether she is told of the moment or not, Jane Doe will have pain and anxiety relieving medications administered to her during the period of ventilator discontinuance and if nature takes its course, she will succumb peacefully to the rest she has chosen.

If she is told the moment the ventilator is going to be discontinued, she will have a last opportunity to change her mind and so communicate it. If she is not, there is a theoretical or hypothetical, possibility that if she were undergoing a change of mind, such change might not be communicated before the actual removal of the ventilator. To foreclose that possibility as much as humanly possible, Jane Doe must be told by the physicians that the ventilator will be removed sometime within the succeeding 48-hour hour period of being so told. If for whatever reason the ventilator is not removed within 48 hours of such advice or advisement to Jane Doe, the respi-

rator shall *not* be removed from her without further approval from this court.

For this reason, the court will retain jurisdiction. The court declares the following

## CONCLUSIONS OF LAW

(1) The issues joined before the court constitute a case and controversy justiciable for judicial determination.

(2) The refusal of medical treatment or the discontinuance of medical treatment by a person is a common law right to self-determination and a right of privacy under the U.S. Constitution, Amendment 14, section 1.

(3) Such right is not absolute. It is subject to the state's interest in the preservation of life, protection of and for innocent third parties, prevention of suicide, and maintenance of the ethical integrity of medical practice.

(4) A person who is competent and asserts or requests a refusal of medical treatment or its continuance, has standing to bring an action for appropriate relief in his or her own name.

(5) Mental competence for such purposes involves the following determinations: (1) Does the patient understand his/her current condition? (2) Is the patient able to make independent decisions about her welfare and medical treatment? (3) Does the patient understand what would happen if the current condition goes untreated? (4) Does the patient understand what the proposed treatment consists of? (5) Does the patient understand the complications, benefits and risks of the proposed treatment? (6) Finally, overall does the patient have the ability to perceive the world realistically, think clearly and make a judgment of the above consider-

ations with an accurate understanding of the consequences of such conduct both physically and emotionally to himself/herself, his/her family, and her loved ones.

(6) Jane Doe is competent to make an informed, intelligent and independent decision concerning her mode of treatment, its refusal and discontinuance.

(7) Based on the findings of fact in this case, no state interest as above set forth nor any combination thereof is paramount to Jane Doe's right to privacy and self-determination.

(8) The denial of Jane Doe's choice by any agency of the commonwealth or by this court would constitute a violation of her right to due process under the U.S. Constitution, Amendment 14, section 1 and under the Pennsylvania Constitution, Article 1, section 9.

(9) The removal or discontinuance of the ventilator or any other life support system, by the physician and/or hospital or any other person designated by either of them is not conduct which aids or abets the commission of a suicide prohibited by 18 Pa.C.S. §2505 (Purdon, 1973) nor is it criminal conduct violative of any other criminal statute in or of this commonwealth.

(10) The removal or discontinuance of the ventilator or any other life support system by the physician and/or hospital or any other person designated by either of them is not conduct which constitutes the crimes of criminal homicide under 18 Pa.C.S. §2501 et seq. (Purdon, 1973) or any other conduct defined as a crime in or of this commonwealth.

(11) No civil liability attaches or shall attach, either under the statute or case law of this commonwealth, on the part of the physician or hospital or any person designated by either of them by reason

of the removal or discontinuance of the ventilator or any other life support system.

(12) The attorney general is a named party to this action.

(13) The court retains jurisdiction.

## DECREE NISI

And now, this August 19, 1987, it is hereby ordered and decreed that the attending physician and hospital are authorized and empowered to adhere to Jane Doe's request and to remove the life support systems of Jane Doe in conformity with this opinion, without incurring any criminal or civil liability under the laws of this commonwealth therefrom.

## ORDER

And now, this August 26, 1987, the below listed persons[6] having appeared in response to the order of this court dated August 19, 1987, and having no objections to the order of the court, it is hereby ordered and decreed that the decree nisi entered August 19, 1987, is hereby made absolute and final.

---

6. Those present: Leonard Zack, counsel for Jane Doe; Brian M. Peters, counsel for hospital and attending physician; James R. O'Dell, substituting for Neal Colton, counsel for attending physician; Gail Barthold, representing the district attorney's office.

Those not present: LeRoy Zimmerman, attorney general of Pennsylvania; Maria Parisi Vickers, chief deputy attorney general for Eastern Region.