741 P.2d 674

Mildred **RASMUSSEN** by Douglas P. **MITCHELL**, her Guardian ad Litem, Appellant,

v.

Robert **FLEMING**, Pima County Public Fiduciary, as Guardian for Mildred Rasmussen, Appellee.

No. CV–86–0450–PR.

Supreme Court of Arizona, En Banc.

July 23, 1987.

John J. Jakubczyk, Phoenix, Americans United for Life Legal Defense Fund by Edward R. Grant, Clarke D. Forsythe, Chicago, Ill., for amicus curiae Americans United for Life Legal Defense Fund.

Clinical Law Office, University of Maryland, School of Law by Stanley S. Herr, Associate Professor, Gisele Matthews, Law Student, Baltimore, Md., for amici curiae for the Ass'n for Retarded Citizens of the U.S., the Ass'n for Retarded Citizens of Arizona, and the Intern. League of Societies for Persons with Mental Handicap.

Public Interest Law Center of Philadelphia by Frank J. Laski, Philadelphia, Pa., for amicus curiae The Ass'n for Persons with Severe Handicaps.

Douglas P. Mitchell, Tucson, for appellant.

Robert B. Fleming, Former Pima County Public Fiduciary, Kate McMillan, Pima County Public Fiduciary, Alyce Pennington, Tucson, for appellee.

Society for the Right to Die, Inc. by Fenella Rouse, New York City, for amicus curiae Society for the Right to Die, Inc.

Mark J. Theut, Phoenix, National Legal Center for the Medically Dependent and Disabled by James Bopp, Jr., Thomas J. Marzen, Thomas J. Balch, Mary M. Nimz, Indianapolis, Ind., for amicus curiae Bd. of Directors of the United Handicapped Federation.

GORDON, Chief Justice.

Not long ago the realms of life and death were delineated by a bright line. Now this line is blurred by wondrous advances in medical technology—advances that until recent years were only ideas conceivable by such science-fiction visionaries as Jules Verne and H.G. Wells. Medical technology has effectively created a twilight zone of suspended animation where death commences while life, in some form, continues. Some patients, however, want no part of a life sustained only by medical technology. Instead, they prefer a plan of medical treatment that allows nature to take its course and permits them to die with dignity.

As more individuals assert their right to refuse medical treatment, more frequently do the disciplines of medicine, law, philosophy, technology, and religion collide. This interdisciplinary interplay raises many questions to which no single person or profession has all the answers. Thus, we approach this case of first impression involving the right to refuse medical treatment with extreme caution and humility, mindful

of the profound and overwhelming sense of responsibility that accompanies the power to resolve what in this and similar future medical treatment cases are all too often life-and-death issues.

## FACTS

Mildred Rasmussen was admitted to the Posada Del Sol Nursing Home in Tucson in 1979 at the age of 64. Before her admission she had led an independent life, formerly practicing as a chiropractor. After admission, Rasmussen's physical and mental conditions deteriorated to the point where she received fluids and nourishment through a nasogastric tube.

The Pima County Public Fiduciary commenced a proceeding in Pima County Superior Court in May 1985 to be appointed as guardian for the purpose of consenting to removal of the nasogastric tube.[1] The court, acting pursuant to A.R.S. § 14–5303, appointed a guardian ad litem as counsel for Rasmussen, a physician to examine Rasmussen, and a "visitor"[2] to visit Rasmussen. Rasmussen's immediate family members, three siblings residing in Iowa, were notified of the guardianship proceedings.

Testimony at the guardianship proceedings indicated that Rasmussen had suffered three strokes and was suffering from a degenerative neural muscular disease and/or an organic brain syndrome. She was unable to care for herself and remained in bed in a fetal position. Nurses administered basic care and medication. After considering Rasmussen's diagnosis and prognosis, her treating physician had placed on her chart a "do not resuscitate" (DNR) order and a "do not hospitalize" (DNH) order. The DNR order directed that Rasmussen not be resuscitated if she suffered cardiac arrest or a similar condition. The DNH order permitted medical personnel to provide only basic comfort care. Certain diseases, such as pneumonia, gangrene, and urinary tract infections, were to run their natural course. Although Rasmussen's siblings did not take an active role in the determination of Rasmussen's treatment, they expressed a willingness to abide by the decision to place DNR and DNH orders on Rasmussen's medical chart. The guardian ad litem objected to the appointment of the Public Fiduciary as guardian unless there was an affirmative order that the guardian remove the DNR and DNH orders from the medical chart.

Debra Douthitt, a case investigator for the Pima County Public Fiduciary, testified that although Rasmussen occasionally opened her eyes upon being touched, she could not visually track or respond to Douthitt's commands. Douthitt also testified that nurses thought Rasmussen still retained some cognitive functioning because Rasmussen would make throaty sounds or spew mucus when the nasogastric tube was removed and reinserted. Lynn Peterson, Rasmussen's advocate-friend, testified that Rasmussen would respond to certain questions or other stimuli by moving her eyes or making humming or grunting noises. Peterson believed that Rasmussen still had the ability to think but simply could not express her thoughts. Stephen Cox, medical director of the long-term care division of the Department of Aging and Medical Services of Pima County, medical director at Posada Del Sol, and Rasmussen's former physician, testified that Rasmussen had been in a nonverbal and essentially vegetative state since 1983. Dr. Cox had never been able to elicit a response to stimulus that would indicate a real cognitive basis for the response. In his opinion, Rasmussen existed in a chronic vegetative state from which she had a zero probability of returning to a higher level of

---

1. For some reason, Rasmussen's physician removed the nasogastric tube after the petition for guardianship was filed and was surprised to learn that Rasmussen could swallow food on her own. The nursing staff, however, still had to place the food into Rasmussen's mouth. The record does not indicate whether the tube was ever reinserted.

2. "[A] visitor is ... a person trained in law, nursing or social work and is an officer, employee or special appointee of the court designated as a court investigator with no personal interest in the proceedings." A.R.S. § 14–5308 (Supp.1986).

functioning. William Masland, a court-appointed neurologist, testified that Rasmussen existed in a profound vegetative state from which she would never recover. According to Dr. Masland, Rasmussen was brain-dead because all parts of her brain necessary for any sort of cognitive function, self-awareness, and perception of surroundings no longer functioned. Masland also stated that stimulus response did not necessarily indicate cognitive perception. In Masland's opinion, the stimulus responses suggested during earlier testimony were no more than primitive reflexive movements.

After the two-day evidentiary hearing, the trial court in its findings of fact concluded that Rasmussen had existed in a chronic vegetative state since May 1983 and that Rasmussen's wishes regarding her present care could not be determined from evidence presented. As a matter of law, the trial court concluded that Rasmussen was incapacitated as statutorily defined;[3] a guardian of an incapacitated person has the authority to exercise the ward's right to refuse care; the proper method for a guardian to determine the appropriateness of refusing care for the ward is the "substituted judgment" approach whereby the guardian's decisions are guided by the ward's prior acts, writings, and statements concerning medical care; if the guardian is unable to apply the "substituted judgment" approach, then his decisions should be guided by the ward's "best interests"; and the guardian's decision to withhold care for a ward is subject to court review. The trial court then appointed the Public Fiduciary as Rasmussen's guardian without restriction.

The guardian ad litem appealed the trial court's decision to appoint the guardian without restriction. Before the court of appeals rendered its decision, Rasmussen died from complications following pneumonia. The court nevertheless retained the matter for decision because "[t]he issues presented here are of great importance to legal practitioners, families, guardians, doctors, hospitals and nursing home staff who face similar situations on a daily basis...." *Rasmussen v. Fleming*, 154 Ariz. 200, 201, 741 P.2d 667, 668 (App.1986). The court then held: (1) the Medical Treatment Decision Act was inapplicable in this case; (2) the right to refuse medical treatment is based upon the federal and state constitutional right of privacy; (3) no state interests were sufficient to counterbalance Rasmussen's right of privacy; (4) either a family member or a guardian could assert Rasmussen's right to refuse medical treatment; and (5) in this and future cases where the incompetent patient has never expressed her medical desires, decisions concerning the patient's medical treatment are to be guided by the "best interests" standard. The court also enunciated certain procedural safeguards to follow in similar cases when determining which types of persons can make decisions for individuals incapable of making decisions.

We granted the guardian ad litem's petition for review and have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and Rule 23, Ariz.R.Civ.App.Proc., 17A A.R.S. (1986 Supp.).

## MOOTNESS

■ This particular controversy became moot when Rasmussen died. We have discretion, however, to decide questions which have become moot. *See State v. Valenzuela*, 144 Ariz. 43, 44, 695 P.2d 732, 733 (1985); *Miceli v. Industrial Commission*, 135 Ariz. 71, 73, 659 P.2d 30, 32 (1983).

■ The novel and difficult issues underlying this proceeding transcend the physical problems that afflicted Rasmussen and did not perish with her. The underlying issues are of significant public importance and are capable of repetition but are likely to evade full review, even when review is expedited.

---

3. A.R.S. § 14–5101 defines "incapacitated person" as

any person who is impaired by reason of mental illness, mental deficiency, mental disorder, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication or other cause, except minority, to the extent he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person.

Other jurisdictions have declined to rely on the death of the real party in interest and the mootness doctrine to avoid resolving issues raised in medical treatment cases.[4] We follow in their footsteps and exercise our jurisdiction to confront the issues and reach the merits of this case.

## RIGHT TO REFUSE MEDICAL TREATMENT

We first address whether Rasmussen had a statutory, constitutional, or common-law right to refuse medical treatment.

### A. Statutory Right

█ In 1985 the Arizona legislature enacted the Medical Treatment Decision Act (MTDA). *See* A.R.S. §§ 36–3201 to –3210. The MTDA provides: "A person may execute a declaration directing the withholding or withdrawal of life-sustaining procedures in a terminal condition." A.R.S. § 36–3202(A). "Terminal condition" is defined as "an incurable or irreversible condition from which, in the opinion of the attending physician, death will occur without the use of life-sustaining procedures." A.R.S. § 36–3201(6).

The MTDA did not provide Rasmussen with a statutory right to refuse medical treatment for two reasons. First, Rasmussen never executed the required declaration. Second, Rasmussen was not suffering from a "terminal condition" as defined above because her physicians were not administering any life-sustaining procedures without which she would have died.[5]

### B. Federal Constitutional Right

█ The U.S. Constitution does not expressly mention privacy or a right of privacy. Nevertheless, "the [Supreme] Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). This right to privacy emanates from the penumbra of specific guarantees of particular amendments to the Constitution. *Id.* Although the parameters of the right to privacy never have been clearly defined, "personal rights found in this guarantee of personal privacy must be limited to those which are 'fundamental' or 'implicit in the concept of ordered liberty.'" *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976). Matters relating to marriage, procreation, contraception, family relationships, and child rearing and education generally have been encompassed by this penumbral right.[6] *Id.; accord State v. Murphy,* 117 Ariz. 57, 60, 570 P.2d 1070, 1073 (1977).

█ The Supreme Court has yet to hold that the right to privacy encompasses

---

4. *See, e.g., Matter of Farrell,* 212 N.J.Super. 294, 514 A.2d 1342 (1986), *affirmed,* 108 N.J. 335, 529 A.2d 404 (N.J.1987); *Matter of Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985); *Bartling v. Superior Court,* 163 Cal.App.3d 186, 209 Cal.Rptr. 220 (1984); *John F. Kennedy Memorial Hospital, Inc. v. Bludworth,* 452 So.2d 921 (Fla.1984); *In re L.H.R.,* 253 Ga. 439, 321 S.E.2d 716 (1984); *Matter of Guardianship of Hamlin,* 102 Wash.2d 810, 689 P.2d 1372 (1984); *Eichner v. Dillon,* 73 A.D.2d 431, 426 N.Y.S.2d 517 (N.Y.App.Div. 1980), *modified on other grounds sub nom., Matter of Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, *cert. denied, Storar v. Storar,* 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981); *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977).

5. Because the record does not indicate that Rasmussen's physicians ever reinserted the nasogastric tube prior to her death, we express no opinion on whether insertion of a nasogastric tube places a patient in a "terminal condition" as statutorily defined.

6. *See, e.g., Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (child rearing and education); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (abortion); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (contraception); *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 32 L.Ed.2d 542 (1969) (possession of obscene material in own home); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (marriage); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (family relationships); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (procreation). *But see Bowers v. Hardwick,* — U.S. —, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (right to privacy does not encompass right to engage in homosexual sodomy in own home); *State v. Murphy,* 117 Ariz. 57, 570 P.2d 1070 (1977) (federal constitutional right to privacy does not encompass right to possess or ingest marijuana in own home).

the right to refuse medical treatment.[7] Nevertheless, numerous state courts have reasoned from Supreme Court decisions that the right to privacy is broad enough to grant an individual the right to chart his or her own medical treatment plan.[8] We agree with our sister states. The right to refuse medical treatment is a personal right sufficiently "fundamental" or "implicit in the concept of ordered liberty" to fall within the constitutionally protected zone of privacy contemplated by the Supreme Court.[9]

### C. State Constitutional Right

Some state courts have held that the right to refuse medical treatment is also a state constitutional right.[10] We hold that the Arizona Constitution also provides for a right to refuse medical treatment.

■ Unlike the federal constitution, the Arizona Constitution expressly provides for a right to privacy. Article 2 of the Arizona Constitution provides:

### § 8. Right to privacy

Section 8. No person shall be disturbed in his private affairs, or his home invaded, without authority of law.

Although Arizona Constitution article 2, § 8 has been invoked most often in a Fourth Amendment context, we see no reason not to interpret "privacy" or "private affairs" as encompassing an individual's right to refuse medical treatment. An individual's right to chart his or her own plan of medical treatment deserves as much, if not more, constitutionally-protected privacy than does an individual's home or automobile.

### D. Common-Law Right

■ The common law has long recognized an individual's right to be free from bodily invasion. Nearly a century ago the Supreme Court noted:

No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of

---

7. *But see Doe v. Bolton,* 410 U.S. 179, 213, 93 S.Ct. 739, 758, 35 L.Ed.2d 201 (1973) (Douglas, J., concurring) (*"[T]he freedom to care for one's health and person"* is constitutionally protected.) (emphasis in original).

8. *See, e.g., Bouvia v. Superior Court,* 179 Cal. App.3d 1127, 225 Cal.Rptr. 297 (1986); *Brophy v. New England Sinai Hospital, Inc.,* 398 Mass. 417, 497 N.E.2d 626 (1986); *Farrell,* 212 N.J.Super. at 294, 514 A.2d at 1342; *Foody v. Manchester Memorial Hospital,* 40 Conn.Sup. 127, 482 A.2d 713 (1984); *Matter of Welfare of Colyer,* 99 Wash.2d 114, 660 P.2d 738 (1983); *Severns v. Wilmington Medical Center, Inc.,* 421 A.2d 1334 (Del.1980); *Matter of Spring,* 380 Mass. 629, 405 N.E.2d 115 (1980); *Leach v. Akron General Medical Center,* 68 Ohio Misc. 1, 426 N.E.2d 809 (1980); *Satz v. Perlmutter,* 362 So.2d 160 (Fla. Dist.Ct.App.1978), *affirmed,* 379 So.2d 359 (Fla. 1980); *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977); *Matter of Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied sub nom., Garger v. New Jersey,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).

9. An individual successfully can assert his or her constitutional right to privacy only against governmental acts and not against acts of a private defendant unless "state action" exists. *See Polin v. Dun & Bradstreet, Inc.,* 768 F.2d 1204, 1207 (10th Cir.1985). "State action" is present when "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). We believe that the state's authority to license and regulate hospital, medical, dental and optometric service corporations (A.R.S. §§ 20–821 *et seq.*), health care institutions (A.R.S. §§ 36–401 *et seq.*), and physicians, surgeons, and nurses (A.R.S. §§ 32–1401 *et seq.,* 32–1601 *et seq.,* 32–1821 *et seq.*), and its supervisory authority over the guardianship of incapacitated persons (A.R.S. §§ 14–5301 *et seq.*) are factors that taken together are sufficient to establish state action herein. *See Colyer,* 99 Wash.2d at 120, 660 P.2d at 742; *Eichner,* 73 A.D.2d at 460, 426 N.Y.S.2d at 540.

10. States which have held that the right to refuse medical treatment is both a federal and state constitutional right include California (*Bouvia,* 179 Cal.App.3d at 1137, 225 Cal.Rptr. at 301), Florida (*In re Guardianship of Barry,* 445 So.2d 365 (Fla.Dist.Ct.App.1984) (noting state constitution was amended after *Satz* to recognize that right to privacy encompassed decisions affecting medical treatment)), New Jersey (*Quinlan,* 70 N.J. at 39, 355 A.2d at 663), and Washington (*Colyer,* 99 Wash.2d at 120, 660 P.2d at 742).

others, unless by clear and unquestionable authority of law:

*Union Pacific Railway Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). Judge Cardozo, during his tenure as a member of New York's highest tribunal, succinctly captured the spirit of the Supreme Court's language when he wrote:

> Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.

*Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 129–30, 105 N.E. 92, 93 (1914).

Protection of this common-law right to be free from nonconsensual bodily invasions is at the heart of what is known today as the doctrine of informed consent. Under this doctrine,

> the patient must have the capacity to reason and make judgments, the decision must be made voluntarily and without coercion, and the patient must have a clear understanding of the risks and benefits of the proposed treatment alternatives or nontreatment, along with a full understanding of the nature of the disease and the prognosis.

Wanzer, *et al., The Physician's Responsibility Toward Hopelessly Ill Patients,* 310 New Eng.J.Med. 955, 957 (1984). *Cf. Conroy,* 98 N.J. at 346, 486 A.2d at 1222; *Colyer,* 99 Wash.2d at 121, 660 P.2d at 743.

The purpose underlying the doctrine of informed consent is defeated somewhat if, after receiving all information necessary to make an informed decision, the patient is forced to choose only from alternative methods of treatment and precluded from foregoing all treatment whatsoever. We hold that the doctrine of informed consent—a doctrine borne of the common-law right to be free from nonconsensual physical invasions—permits an individual to refuse medical treatment.[11]

## STATE INTERESTS

Whether emanating from constitutional penumbras or premised on common-law doctrine, the right to refuse medical treatment is not absolute. Courts have held that the right may be limited by the state's interest in preserving life, safeguarding the integrity of the medical profession, preventing suicide, and protecting innocent third parties.[12]

### A. Preserving life

■ The state's interest in preserving life is the most significant interest asserted by the state. *Conroy,* 98 N.J. at 348, 486 A.2d at 1223; *Colyer,* 99 Wash.2d at 121, 660 P.2d at 743; *Saikewicz,* 373 Mass. at 740, 370 N.E.2d at 425. It embraces the separate but related concerns of preserving the life of a particular individual as well as preserving the sanctity of all life. *Conroy,* 98 N.J. at 348, 486 A.2d at 1223.

■ Although the state's interest in preserving life is justifiably strong, we believe this interest necessarily weakens and must yield to the patient's interest where treatment at issue "serves only to prolong a life inflicted with an incurable condition." *Colyer,* 99 Wash.2d at 122, 660 P.2d at

---

**11.** Other courts also have held that the right to refuse medical treatment is both a constitutional right and a common-law right. *See, e.g., Brophy,* 398 Mass. at 430, 497 N.E.2d at 633; *Farrell,* 212 N.J.Super. at 298, 514 A.2d at 1344; *Foody,* 40 Conn.Sup. at 130–34, 482 A.2d at 717–18; *Colyer,* 99 Wash.2d at 119–22, 660 P.2d at 741–43. *Cf. Conroy,* 98 N.J. at 321, 486 A.2d at 1209 (court recognized constitutional right but limited its holding to application of common-law right); *Matter of Conservatorship of Torres,* 357 N.W.2d 332, 339–40 (Minn.1984) (court recognized constitutional and common-law right but premised its holding on constitutional and statutory right); *Storar,* 52 N.Y.2d at 376, 420 N.E.2d at 70 (whether right to refuse medical treatment is guaranteed by the Constitution is a "disputed question"; court premised its holding on "common-law principles").

**12.** *See, e.g., Conroy,* 98 N.J. at 348, 486 A.2d at 1223; *Foody,* 40 Conn.Sup. at 132–34, 482 A.2d at 718; *Bartling,* 163 Cal.App.3d at 195, 209 Cal. Rptr. at 225; *Colyer,* 99 Wash.2d at 122, 660 P.2d at 743; *Leach,* 68 Ohio Misc. at 8, 426 N.E.2d at 814; *Satz,* 362 So.2d at 162; *Saikewicz,* 373 Mass. at 740, 370 N.E.2d at 425.

743.[13] Such is the case here. The chance that any medical treatment would have brought Rasmussen out of her chronic vegetative state and returned her to a cognitive state was minimal, if not nonexistent. Hospitalization or resuscitation would have only postponed Rasmussen's death rather than have improved her life.

Based on these observations, we decline to hold that the state's interest in preserving life outweighed Rasmussen's right to refuse medical treatment.

*B. Safeguarding integrity of medical profession*

■ The state's interest in preserving the ethical integrity of the medical profession is not readily apparent here. No member of the medical community opposed the medical treatment decisions in this case. In fact, it was Rasmussen's physician who placed the DNR and DNH orders on her chart. Thus, no real conflict existed between the patient and the medical profession that would impugn the latter's ethical integrity. *See Farrell,* 212 N.J.Super. at 300, 514 A.2d at 1345.

■ Even if a conflict had existed, however, we would have hesitated to find that Rasmussen's interest must yield to the state's interest. The medical profession itself now recognizes that it is no longer obligated to provide medical treatment in all situations. The American Medical Association, through its Council on Ethical and Judicial Affairs, issued the following statement dated March 15, 1986:

Withholding or Withdrawing Life
Prolonging Medical Treatment

The social commitment of the physician is to sustain life and relieve suffering. Where the performance of one duty conflicts with the other, the choice of the patient, or his family or legal representative if the patient is incompetent to act in his own behalf, should prevail. In the absence of the patient's choice or an authorized proxy, the physician must act in the best interest of the patient.

For humane reasons, with informed consent, a physician may do what is medically necessary to alleviate severe pain, or cease or omit treatment to permit a terminally ill patient whose death is imminent to die. However, he should not intentionally cause death. In deciding whether the administration of potentially life-prolonging medical treatment is in the best interest of the patient who is incompetent to act in his own behalf, the physician should determine what the possibility is for extending life under humane and comfortable conditions and what are the prior expressed wishes of the patient and attitudes of the family or those who have responsibility for the custody of the patient.

*Even if death is not imminent but a patient's coma is beyond doubt irreversible and there are adequate safeguards to confirm the accuracy of the diagnosis and with the concurrence of those who have responsibility for the care of the patient, it is not unethical to discontinue all means of life prolonging medical treatment.*

Life prolonging medical treatment includes medication and artificially or technologically supplied respiration, nutrition or hydration. In treating a terminally ill or irreversibly comatose patient, the physician should determine whether the benefits of treatment outweigh its burdens. At all times, the dignity of the patient should be maintained. (Emphasis added).[14]

13. *See Saikewicz,* 373 Mass. at 740–43, 370 N.E.2d at 425–26 ("There is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether, but when, for how long, and at what cost to the individual that life may be briefly extended."); *Quinlan,* 70 N.J. at 41, 355 A.2d at 664 ("We think that the State's interest [in preserving life] weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims.").

14. *See also Saikewicz,* 373 Mass. at 742–45, 370 N.E.2d at 426–27; *Bartling,* 163 Cal.App.3d at 196, 209 Cal.Rptr. at 225; *Storar,* 52 N.Y.2d at 373 n. 3, 420 N.E.2d at 75–76 n. 3 (Jones, J., dissenting in part) (recent surveys suggest that majority of practicing physicians now approve of passive euthanasia and believe that it is being

The emphasized language suggests that medical ethics would not be questioned if a DNR or DNH order were placed on the chart of a patient suffering from an irreversible coma. Rasmussen was not in a coma, but she was in an irreversible chronic vegetative state. We fail to see any material significance between the two physical conditions.[15] Therefore, the above statement issued by the AMA leads us to believe that this case does not bring into disrepute the ethical integrity of the medical profession.

### C. Preventing suicide

■ Asserting the right to refuse medical treatment is not tantamount to committing suicide. "Refusing medical intervention merely allows the disease to take its natural course; if death were eventually to occur, it would be the result, primarily, of the underlying disease, and not the result of a self-inflicted injury." *Conroy*, 98 N.J. at 351, 486 A.2d at 1224. *See also Foody*, 40 Conn.Sup. at 137, 482 A.2d at 720; *Colyer*, 99 Wash.2d at 121, 660 P.2d at 743; *Saikewicz*, 373 Mass. at 743 n. 11, 370 N.E.2d at 426 n. 11.

■ Furthermore, Arizona's legislature has recognized that "[t]he withholding or withdrawal of life-sustaining procedures from a qualified patient in accordance with [the MTDA] does not, for any purpose, constitute a suicide." A.R.S. § 36–3208.

Although we have held that the MTDA is inapplicable in this case, it would be illogical indeed to suggest that the state's interest in preventing suicide magically disappears only when an individual becomes terminally ill and completes certain paperwork. Perhaps in some cases the state's interest in preventing suicide will limit an individual's ability to assert his or her right to refuse medical treatment. *See, e.g., In re Caulk*, 125 N.H. 226, 480 A.2d 93 (1984) (state could force-feed prisoner who was starving himself to death because he preferred death to life imprisonment). This is not such a case.[16]

### D. Protecting innocent third parties

■ Rasmussen's decision to forego medical treatment will not adversely or directly affect the health, safety, or security of others. Rasmussen had no children, and her only immediate family, three siblings, resided in another state and had agreed to abide by the decision of the physician and guardian to terminate treatment. We find no interests of third parties in this case.[17]

### INCOMPETENCY AND THE RIGHT TO REFUSE MEDICAL TREATMENT

■ Ordinarily, only the person whose common-law or constitutional rights are at issue may assert them. A competent person clearly has the ability to exercise the right to refuse medical treatment. So, too,

---

practiced by members of the profession); *Quinlan*, 70 N.J. at 46, 355 A.2d at 667.

15. "A coma, I think, and a chronic vegetative state differentiate only by the fact that in a coma a person appears to be asleep all the time. In chronic vegetative state, there may be cycles of asleep and wakeness, although in neither state does the patient really communicate with the environment." Testimony of Dr. Stephen Cox, Trial Transcript of September 17, 1985, at 80.

16. Although Arizona makes no provision for criminal punishment of suicide, A.R.S. § 13–1103(A) provides that a person commits manslaughter by intentionally aiding another to commit suicide. Because we hold that the medical treatment decisions made in this case were not decisions to commit suicide, neither the physicians, nurses, health care facility, guardian, guardian ad litem, nor any similarly

situated individual or entity can be charged with manslaughter.

17. *Cf. Jacobson v. Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (compulsory smallpox vaccination law enforced); *Application of President & Directors of Georgetown College, Inc.*, 331 F.2d 1000, *cert. denied*, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964) (mother of seven-month-old infant compelled to submit to blood transfusion over her religious objections); *Commissioner of Correction v. Myers*, 379 Mass. 255, 399 N.E.2d 452 (1979) (to prevent serious risk to prison security, prisoner with kidney disease compelled to undergo dialysis over his protest that treatment rendered him unable to defend himself); *John F. Kennedy Memorial Hospital v. Heston*, 58 N.J. 576, 279 A.2d 670 (1971) (young unmarried pregnant woman compelled to submit to blood transfusion that would save her life and likely permit her to live normal healthy life).

does an incompetent individual who has made his or her medical desires known prior to becoming incompetent. *See, e.g.,* §§ 36–3201 *et seq.* (MTDA). Unfortunately, this case involved an individual who was incompetent at the time medical treatment became an issue and who had not expressed her medical treatment desires prior to becoming incompetent.

We are not the first tribunal to confront this problem. Other jurisdictions have unanimously concluded that the right to refuse medical treatment is not lost merely because the individual has become incompetent and has failed to preserve that right.[18] Reasons for this conclusion have been best articulated by the New York Supreme Court:

> We ... conclude that by standards of logic, morality and medicine the terminally ill should be treated equally, whether competent or incompetent. Can it be doubted that the "value of human dignity extends to both"? What possible societal policy objective is vindicated or furthered by treating the two groups of terminally ill *differently?* What is gained by granting such a fundamental right only to those who, though terminally ill, have not suffered brain damage and coma in the last stages of the dying process? The very notion raises the spectre of constitutional infirmity when measured against the Supreme Court's recognition that incompetents must be afforded all their due process rights; indeed any State scheme which irrationally denies to the terminally ill competent pa-

tient is plainly subject to constitutional attack.

*Eichner,* 73 A.D.2d at 464–465, 426 N.Y. S.2d at 542–43 (emphasis in original; citations omitted).

We conclude that Rasmussen's right to refuse medical treatment still existed despite her incompetency and her failure to articulate her medical treatment desires prior to becoming incompetent. Because she was incapable of exercising that right, however, we must determine who could exercise that right for her.

## WHO CAN EXERCISE AN INCOMPETENT'S RIGHT TO REFUSE MEDICAL TREATMENT

■ The court of appeals held that either a family member or a guardian could exercise Rasmussen's right to refuse medical treatment. 154 Ariz. at 205, 741 P.2d at 672.[19] Its decision was based on United States Supreme Court cases holding that a third party has standing to assert the constitutional rights of others if a substantial relationship exists between the claimant and the third party, assertion of the constitutional right by the claimant is impossible, and the claimant's constitutional right will be diluted if the third party is not allowed to assert it. *See Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

---

**18.** *See Conroy,* 98 N.J. at 359, 486 A.2d at 1229; *Foody,* 40 Conn.Sup. at 133, 482 A.2d at 718; *John F. Kennedy Memorial Hospital,* 452 So.2d at 923; *Barry,* 445 So.2d at 370 (footnote omitted) ("[T]he constitutional right of privacy would be an empty right if one who is incompetent were not granted the right of a competent counterpart to exercise his rights."); *Colyer,* 99 Wash.2d at 123, 660 P.2d at 744; *Severns,* 421 A.2d at 1347 ("[T]o deny the exercise because the patient is unconscious would be to deny the right."); *Saikewicz,* 373 Mass. at 736, 744, 370 N.E.2d at 427; *Quinlan,* 70 N.J. at 41, 355 A.2d at 664 ("If a putative decision by Karen to permit this non-cognitive, vegetative existence to terminate by natural forces is regarded as a valuable incident of her right to privacy ... then it should not be discarded solely on the

basis that her condition prevents her conscious exercise of the choice.").

**19.** The court of appeals also developed a "priority list" of surrogate decisionmakers to minimize the amount of judicial intervention in future similar cases. 154 Ariz. at 206–207, 741 P.2d at 673–674 (judicially appointed guardian, person(s) designated by patient, spouse, adult child or majority of adult children, parents, nearest living relative, attending physician). We acknowledge that not all surrogate decisionmakers will be court-appointed guardians. We decline, however, to develop a "priority list" in this case of first impression and vacate this portion of the court of appeals' opinion.

We need not decide today whether a family member could or could not exercise Rasmussen's right to refuse medical treatment because no family member ever attempted to do so in this case. The facts of this case limit our review to a determination only of whether the Public Fiduciary as guardian could vicariously exercise Rasmussen's right to refuse medical treatment.

 Although the above-cited caselaw gives the Public Fiduciary standing to assert Rasmussen's right to refuse medical treatment, we disagree with the court of appeals that it permits the Public Fiduciary to exercise that right. As the guardian ad litem noted:

> The logical extension of the Court of Appeals['] reasoning is that the person with standing to assert a constitutional right in court could also make the decision for the third person as to whether they could or should receive contraceptives or become a member of the NAACP. Obviously, this is not the reasoning of the Supreme Court of the United States....

Petition for Review, Appendix B at 1.

Instead of relying on Supreme Court caselaw, our analysis begins with an examination of relevant Arizona statutes. The superior court has subject matter jurisdiction to adjudicate all issues relating to the protection of incapacitated persons. A.R.S. § 14–1302(A)(2). Contained within the court's jurisdiction is the authority to appoint a guardian. A.R.S. §§ 14–5303, –5304. The general powers and duties of a guardian are set forth in A.R.S. § 14–5312, which provides in relevant part: "A guardian may give any consents or approvals that may be necessary to enable the ward to receive medical or other professional care, counsel, treatment or service." A.R.S. § 14–5312(A)(3).

The guardian ad litem argues that a guardian's right to consent to or approve medical treatment does not include the right to refuse medical treatment. Similar arguments were made in *Matter of Guardianship of Hamlin*, 102 Wash.2d 810, 689 P.2d 1372 (1984), and *Matter of Conserva-*

*torship of Torres*, 357 N.W.2d 332 (Minn. 1984).

In *Hamlin*, the guardian had the statutory authority "to care for and maintain the incompetent or disabled person, assert his or her rights and best interests, and provide timely, informed consent to necessary medical procedures." At issue was whether the guardian, as part of his duty "to care for and maintain" Hamlin, could terminate a life support system. The Washington Supreme Court admitted that "a literal dictionary definition would seem to exclude authority to consent to termination. A decision to terminate life support systems, however, transcends dictionary definitions." 102 Wash.2d at 815, 689 P.2d at 1375. The court then observed that the guardian had the statutory authority to assert Hamlin's "rights and best interests" and concluded: "Just as medical intervention is, in the majority of cases, clearly in the best interests of the ward, nonintervention in some cases may be appropriate and, therefore, in the ward's best interest." *Id.* The court then examined the medical evidence, concluded that it was in Hamlin's best interest to terminate the life support system, and thus held that the guardian had the statutory authority to consent to the termination.

In *Torres*, the conservator's duties and powers "include[d], but [were] not limited to ... [t]he power to give any necessary consent to enable the ward or conservatee to receive necessary medical or other professional care...." The court-appointed attorney representing Torres argued that a conservator's order to remove a conservatee's life support system was not a consent to receive necessary medical care. The conservator argued that his consent would be meaningless if it did not include the power to refuse medical treatment. The Minnesota Supreme Court, focusing on the statutory language of "but are not limited to", concluded that the conservator had the implied, if not express, authority to order the removal of life support systems "if the conservatee's best interests are no longer served by the maintenance of life supports...." 357 N.W.2d at 337.

■ Unlike the statute in *Hamlin,* A.R.S. § 14–5312(A)(3) does not give a guardian the right to assert Rasmussen's "best interests." Nevertheless, Arizona caselaw holds:

> The cardinal consideration governing the court in its appointment of a guardian for the person and estate of a ward is how to serve most effectively the best interests and temporal, moral and mental welfare of a living person.

*Countryman v. Henderson,* 17 Ariz.App. 218, 220, 496 P.2d 861, 863 (1972). And although A.R.S. § 14–5312(A) contains introductory language suggesting, as in *Torres,* that a guardian's duties are broader than those specifically enumerated, such introductory language is inapplicable here.[20] We note, however, that A.R.S. § 14–1102 requires us to liberally construe the guardianship statutes.

■ In our opinion, the right to consent to or approve the delivery of medical care must necessarily include the right to consent to or approve the delivery of *no* medical care. To hold otherwise would, as the Washington and Minnesota supreme courts observed, ignore the fact that oftentimes a patient's interests are best served when medical treatment is withheld or withdrawn. To hold otherwise would also reduce the guardian's control over medical treatment to little more than a mechanistic rubberstamp for the wishes of the medical treatment team. This we decline to do. We follow the conclusions reached in *Hamlin* and *Torres* and hold that the Public Fiduciary as Rasmussen's guardian had the implied, if not express, statutory authority to exercise Rasmussen's right to refuse medical treatment.

### LIMITS ON GUARDIAN'S DISCRETION

The guardian ad litem contends that the guardian should not have unbridled discretion to decide whether to refuse any or all medical treatment. We agree.

■ Courts have developed two standards to guide surrogate decisionmaking: "substituted judgment" and "best interests." Under the substituted judgment standard, the guardian "attempt[s] to reach the decision that the incapacitated person would make if he or she were able to choose." President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Deciding to Forego Life-Sustaining Treatment,* 1, 132 (1983) (hereinafter *Commission Report*). This standard best guides a guardian's decisionmaking when a patient has manifested his or her intent while competent.[21] Unfortunately, the record in this

---

**20.** The preface to A.R.S. § 14–5312(A)(3) provides: "A guardian of an incapacitated person has the same powers, rights and duties respecting his ward that a parent has respecting his unemancipated minor child.... In particular, and *without qualifying the foregoing,* a guardian has the following powers and duties...." (emphasis added). We decline to hold that the emphasized language permits us to conclude that a guardian can assert an incapacitated person's right to refuse medical treatment even *though such authority is not specifically* enumerated in § 14–5312(A)(3). Such a holding would require us first to conclude that a parent has the right to assert his unemancipated minor child's right to refuse medical treatment. We have never addressed that factual situation before, nor are we faced with it today. Because of the significant import of today's case, we hesitate to reach any conclusions via a bootstrapping process that would call for resolving issues never previously nor currently before us.

**21.** Such an intent might be embodied in a written document, or 'living will,' stating the person's desire not to have certain types of life-sustaining treatment administered under certain circumstances. It might also be evidenced in an oral directive that the patient gave to a family member, friend, or health care provider. It might consist of a durable power of attorney or appointment of a proxy authorizing a particular person to make the decisions on the patient's behalf if he is no longer capable of making them for himself. It might take the form of reactions that the patient voiced regarding medical treatment administered to others. It might also be deduced from a person's religious beliefs and the tenets of that religion, or from the patient's consistent pattern of conduct with respect to prior decisions about his own medical care.

*Conroy,* 98 N.J. at 361, 486 A.2d at 1229–30 (footnotes and citations omitted).

The substituted judgment standard has been criticized for permitting past preferences to govern subsequent treatment decisions even though a person's interests can change radically over time. *See* Dresser, *Life, Death and Incompetent Patients: Conceptual Infirmities and Hidden Val-*

case is barren of any evidence that Rasmussen expressed her medical desires in any form prior to becoming incompetent. Where no reliable evidence of a patient's intent exists, as here, the substituted judgment standard provides little, if any, guidance to the surrogate decisionmaker and should be abandoned in favor of the "best interests" standard.[22]

Under the best interests standard, the surrogate decisionmaker assesses what medical treatment would be in the patient's best interests as determined by such objective criteria as relief from suffering, preservation or restoration of functioning, and quality[23] and extent of sustained life. *Commission Report* at 135. "An accurate assessment will encompass consideration of the satisfaction of present desires, the opportunities for future satisfactions, and the possibility of developing or regaining the capacity for self-determination." *Id.*[24]

When the Public Fiduciary was appointed as guardian, Rasmussen was completely unable to interact with her environment, and the medical probability that she would ever return to a cognitive sapient state, as distinguished from a chronic vegetative existence, was virtually non-existent. Thus, any medical treatment administered in the absence of the DNH and DNR orders would have provided minimal, if any, benefits and would have only postponed Rasmussen's death rather than improved her life. We believe that the trial court properly concluded that Rasmussen's best interests would be served by the placement and retention of the DNR and DNH orders on her medical chart.

## ROLE OF GUARDIAN AD LITEM

We turn now to briefly address the guardian ad litem's request for a definition of his role in this type of proceeding. Although our comments come too late to offer guidance to the guardian ad litem in this case, they hopefully will assist him and other guardians ad litem in similar future cases.

A guardian ad litem is appointed during guardianship proceedings to represent an incapacitated person if such person has no counsel. A.R.S. § 14–5303. The guardian ad litem's function is to "represent the interest[s]" of the incapacitated person. A.R.S. § 14–1403(4). In representing the

---

*ues in the Law*, 28 Ariz.L.Rev. 373, 379–82 (1986).

**22.** *See Foody*, 40 Conn.Sup. at 139–140, 482 A.2d at 721; *Conroy*, 98 N.J. at 361, 486 A.2d at 1231 ("[I]n the absence of adequate proof of the patient's wishes, it is naive to pretend that the right to self-determination serves as a basis for substituted decision-making."); *Barber v. Superior Court*, 147 Cal.App.3d 1006, 1021, 195 Cal. Rptr. 484, 493; *Commission Report* at 5 ("The decisions of surrogates should, when possible, attempt to replicate the ones that the patient would make if capable of doing so. When lack of evidence about the patient's wishes precludes this, decisions by surrogates should seek to protect the patient's best interests.") (footnote omitted); *id.* at 133 ("The substituted judgment standard can be used only if a patient was once capable of developing views relevant to the matter at hand; further, there must be reliable evidence of those views."); *id.* at 136 (Commission recommends using best interests approach where patient's likely decision is unknown); Note, *Equality for the Elderly Incompetent: A Proposal for Dignified Death*, 39 Stan.L.Rev. 689, 714 (1987) (substituted judgment standard is deficient when patient's intent is unknown); Note, *Live or Let Die; Who Decides an Incompetent's Fate? In re Storar and In re Eichner*, 1982

B.Y.U.L.Rev. 387, 392–93 (criticism of application of substituted judgment standard when no evidence of patient's intent exists). *But see Spring*, 380 Mass. at 635–40, 405 N.E.2d at 120–22 (patient expressed no intent while competent; court relied upon opinion of patient's wife and son and applied substituted judgment); *Saikewicz*, 373 Mass. at 749–53, 370 N.E.2d at 430–31 (court applied substituted judgment standard even though patient was incompetent from birth).

**23.** By "quality of life" we refer to "the value that the continuation of life has for the patient," and not "the value that others find in the continuation of the patient's life...." *Commission Report* at 135 n. 43.

**24.** We reject any suggestion that a patient's best interests can be determined merely by distinguishing active treatment from passive treatment, withholding treatment from withdrawing treatment, ordinary treatment from extraordinary treatment, and mechanical breathing devices from mechanical feeding devices. Such distinctions have been widely criticized. *See, e.g., Conroy*, 98 N.J. at 367–74, 486 A.2d at 1233–36; *Barber*, 147 Cal.App.3d at 1016, 195 Cal.Rptr. at 490; *Commission Report* at 61–77, 82–89.

interests of his ward, the guardian ad litem will perform both procedural and substantive duties.

■ A guardian ad litem's procedural duties will include drafting and mailing to all interested parties any legal documents affecting the incapacitated person. In addition, he will be responsible for receiving and responding to all legal documents mailed to the incapacitated person. Procedurally, however, the guardian ad litem's duty is not necessarily to act as the guardian's adversary.

■ The guardian ad litem's principal substantive duty will be to discover all facts relevant to medical treatment of the patient and report such facts to the court. Such facts will include, but are not limited to:

(a) facts about the incompetent: *i.e.*, age, cause of incompetency, relationship with family members and other close friends, attitude and prior statements concerning life sustaining treatment; (b) medical facts: *i.e.*, prognosis for recovery, intrusiveness of treatment, medical history; (c) facts concerning the state's interest in preserving life: *i.e.*, the existence of dependents; other third party interests; and (d) facts about the guardian, the family, other people close to the incompetent, and the petitioner: *i.e.*, their familiarity with the incompetent, their perceptions of the incompetent's wishes, any potential for ill motives.

*Colyer,* 99 Wash.2d at 133, 660 P.2d at 748–49. If from his factual findings the guardian ad litem concludes that the ward's best interests will not be served by the guardian's proposed actions, the guardian ad litem as "counsel" for the ward can challenge the guardian's conduct during

appointment proceedings and throughout the appellate process. Such was the case here.

## ROLE OF THE COURT

Last, but certainly not least, we address the degree to which judicial involvement is required in this type of case. On this issue, opinions of other jurisdictions diverge. The two leading cases are *Quinlan* and *Saikewicz.*

In *Quinlan,* the New Jersey Supreme Court permitted the withdrawal of life support systems only after Quinlan's guardian-father, other family members, attending physicians, and a hospital ethics committee concurred in such action. The court then wrote:

We consider that a practice of applying to a court to confirm such decisions would generally be inappropriate, not only because that would be a gratuitous encroachment upon the medical profession's field of competence, but because it would be impossibly cumbersome. Such a requirement is distinguishable from the judicial overview traditionally required in other matters such as the adjudication and commitment of mental incompetents. This is not to say that in the case of an otherwise justiciable controversy access to the courts would be foreclosed; we speak rather of a general practice and procedure.

70 N.J. at 50, 355 A.2d at 669.[25]

A different point of view was articulated by the Supreme Judicial Court of Massachusetts in *Saikewicz.* Although the court noted that a probate judge should consider the advice or knowledge of physicians, medical experts, and hospital ethics committees, it concluded:

that the incompetent patient's best interests are served by termination of life sustaining treatment, absent legislation to the contrary, there is no need for judicial involvement in this decision."); *Colyer,* 99 Wash.2d at 127, 660 P.2d at 746 ("In cases where physicians agree on the prognosis and a close family member uses his best judgment as a guardian to exercise the rights of the incompetent, intervention by the courts would be little more than a formality."); *Barber,* 147 Cal.App.3d at 1022, 195 Cal.Rptr. at 493.

---

25. *See also Farrell,* 108 N.J. at 356–358, 529 A.2d at 415; *Matter of Peter,* 108 N.J. 365, 380, 529 A.2d 419, 427 (N.J.1987) ("[J]udicial review of a surrogate's decision to give effect to the patient's preference is unnecessary unless a conflict arises among the surrogate decisionmaker, the family, the physician and the Ombudsman."); *Barry,* 445 So.2d at 372; *In re L.H.R.,* 253 Ga. 439, 439–47, 321 S.E.2d 716, 718–23 (1984); *Hamlin,* 102 Wash.2d at 820, 689 P.2d at 1378 ("[I]f the treating physicians, the prognosis committee, and the guardian are all in agreement

We take a dim view of any attempt to shift the ultimate decision-making responsibility away from the duly established courts of proper jurisdiction to any committee, panel or group, ad hoc or permanent....

We do not view the judicial resolution of this most difficult and awesome question—whether potentially life-prolonging treatment should be withheld from a person incapable of making his own decision—as constituting a "gratuitous encroachment" on the domain of medical expertise. Rather, such questions of life and death seem to us to require the process of detached but passionate investigation and decision that forms the ideal on which the judicial branch of government was created. Achieving this ideal is our responsibility and that of the lower court, and is not to be entrusted to any other group purporting to represent the "morality and conscience of our society," no matter how highly motivated or impressively constituted.

373 Mass. at 758–59, 370 N.E.2d at 434–35.[26]

■ One need only look to the plethora of cases cited *ante* at 214 n. 4, 741 P.2d at 681 n. 4, where arguments were heard or opinions were issued long after the patient had died, to conclude that judicial intervention in decisions of this nature can indeed be unduly cumbersome. A minimal amount of judicial involvement in an incompetent's affairs is unavoidable in cases such as this one, though, where guardianship is sought and an incompetency hearing is required. *See* A.R.S. § 14-5303. Once the court resolves the matters of guardianship and incompetency, however, its encroachment into the substantive decisions concerning medical treatment should be limited to resolving disputes among the patient's family, the attending physicians, an independent physician, the health care facility, the guardian, and the guardian ad litem. Here the guardian ad litem opposed the plan of medical treatment agreed upon by all other interested parties, and the court properly made itself available to resolve the dispute. Where, however, all affected parties concur in the proposed plan of medical treatment, court approval of the proposed plan of medical treatment is neither necessary nor required.

■ If the court is requested to resolve disputes among interested parties, particularly disputes questioning the "substituted judgment" or the "best interests" of the incompetent patient, then evidence necessary to resolve the dispute must be "clear and convincing." Although the typical evidentiary standard in civil cases is "by a preponderance of the evidence," we have recognized the need for a higher standard in exceptional civil matters. *See, e.g., Linthicum v. Nationwide Life Insurance Co.,* 150 Ariz. 326, 723 P.2d 675 (1986) (punitive damages awarded only upon clear and convincing evidence). We deal here with matters that in at least some instances raise life-or-death issues and in all instances involve personal interests more important than those found in the typical civil dispute where private litigants squabble over a sum of money. We hold that court-resolved disputes in cases of this nature must be resolved by clear and convincing evidence. *See also Storar,* 52 N.Y.S.2d at 378, 420 N.E.2d at 72; *Leach,* 68 Ohio Misc. at 10, 426 N.E.2d at 815.

■ The consequences of a decision to terminate medical treatment will often be irreversible. Therefore, the court in any dispute will assume that the patient wishes to continue receiving medical treatment, and the burden to prove otherwise will rest on the party or parties desiring to terminate the treatment.

### CONCLUSION

The case under immediate consideration concerns only Mildred Rasmussen. Yet, the principles and procedures articulated herein undoubtedly will govern future similar cases. Even after today's opinion, however, issues in this area remain unan-

**26.** This portion of *Saikewicz* has been the subject of much commentary and criticism. *See,* *e.g., L.H.R.,* 253 Ga. at 442–45, 321 S.E.2d at 720–21 (summary of selected articles).

swered—some by choice, others by oversight. Issues that we have confronted today, as well as those remaining unresolved, are fraught with moral, ethical, social, medical, and legal considerations. Such issues are not well-suited for resolution in adversarial judicial proceedings. Rather, the Legislature is best suited to address these matters in a comprehensive matter. Only the Legislature has the resources necessary to gather and synthesize the vast quantities of information needed to formulate guidelines that will best accommodate the rights and interests of the many individuals and institutions involved in these tragic situations. Many other courts have reached this same conclusion. *See, e.g., Conroy,* 98 N.J. at 343–46, 486 A.2d at 1220–21; *Hamlin,* 102 Wash.2d at 822, 689 P.2d at 1379; *Satz,* 379 So.2d at 360. Like them, we urge our Legislature to respond to these matters within permissible constitutional limits.

The judgment of the trial court is affirmed. The opinion of the court of appeals is affirmed in part and reversed in part.

CAMERON and HOLOHAN, JJ., concur.

MOELLER, J., did not participate in the determination of this matter.

FELDMAN, Vice Chief Justice, concurring.

I join in the court's opinion, except that portion (154 Ariz. at 223–24, 741 P.2d 690–91) which holds that the final determination to refuse or discontinue medical treatment may be made by the guardian without court supervision or approval. On this question, the court has followed the lead of *Quinlan* and held that the decision in a best-interest case may be made by the guardian in consultation with the family and the physicians. No court order is necessary before implementation of the decision. *See In re Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).

Although one may argue either side of the question, I believe that it would be better policy—even where there is unanimity of opinion between the guardian, the family, and the doctors—that "substituted judgment" and "best interest" decisions be validated by court order. The question of whether to refuse or discontinue treatment is not simply a medical issue to be left to the doctors; although the medical evidence is in many ways determinative, the final decision incorporates a range of ethical, moral, and societal values which should not be left solely to doctors, family members, or representatives of the court, no matter how well informed and well meaning they might be. *See* Annas, *Reconciling Quinlan and Saikewicz: Decision Making for the Terminally Ill Incompetent,* 4 AM.J. LAW & MEDICINE 367 (1979). Such decision making requires the final validation— not necessarily by adversarial hearing— and the detached and neutral inspection of a judicial officer, accountable to the law, and therefore to the public. *See Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977).

If the question were whether to commit a patient for psychiatric treatment for a period of thirty days, no group of doctors, no group of family members, and no guardian appointed by the court could be given the final authority to accomplish such a result, even though they all agreed it was "for her own good." *See* A.R.S. §§ 36–520 *et seq.* In my view, the decision to end whatever life remains in the patient should be given no less care and attention before it becomes irrevocable. Surely, if the system guarantees the patient a hearing before commitment, it must require some hearing before refusal or termination of treatment necessary for life support.